OPINION
{¶ 1} Plaintiff-appellant Larry Mitchell appeals from a judgment against him on his employment discrimination claim, and in favor of defendants-appellees Valerie Lemmie and the City of Dayton (Dayton), based on a directed verdict granted at the conclusion of Mitchell's case in chief. The trial court concluded that there was no direct evidence of *Page 2 
discrimination. In addition, the court found that Mitchell failed to establish two of the prongs required for a prima facie case of discrimination, and failed to prove that Dayton's reason for the hiring decision was pretextual. Finally, the court concluded that Mitchell failed to meet his burden of establishing damages.
 {¶ 2} Mitchell contends that the trial court erred in granting the directed verdict and in failing to either admit or consider various evidence, including Dayton's affirmative action plan and matters pertaining to the National Forum of Black Public Administrators (NFBPA). Mitchell further contends that the court erred in refusing to allow him to pursue claims for spoliation of evidence.
 {¶ 3} We conclude that the trial court erred in refusing to allow Mitchell to amend the complaint to include spoliation claims. The trial court also erred in granting a directed verdict in favor of Dayton and Lemmie. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 I {¶ 4} Larry Mitchell was employed by Dayton from 1977 through March, 2001, when he retired due to a medical disability. Between 1980 and 2001, Mitchell worked in the Department of Public Works, in the Waste Collection Division. Mitchell began as a waste collector and worked his way up through the ranks, advancing to waste collection driver, route supervisor, and eventually, acting division manager or superintendent.
 {¶ 5} Laborers like the waste collectors and drivers are represented by the Association of State, Municipal, and County Employees (ASCME), Local 101, while route supervisors obtain their positions by taking a civil service test. Before Mitchell *Page 3 
became a route supervisor in 1994, he served in the elected position of union steward for the Waste Collection Division for several years. Mitchell was later elected chapter chairman for a union of about 1,300 people, representing all the divisions and departments in the City of Dayton. Mitchell was then elected vice-president and eventually president of Local 101, which had about 3,600 members. During a six-year term as president, Mitchell helped prepare and manage a budget of about half a million dollars, did day-to-day banking for the union, oversaw treasury functions, managed grievances, and conducted contract negotiations. Mitchell also helped the union build a structure for training officers and stewards, and attended training seminars and conventions all over the national union.
 {¶ 6} In 1994, Mitchell took the civil service test to become a supervisor and placed first. He was then selected as a route supervisor in the Waste Collection Division and was thereafter involved on the side of management rather than as a labor representative. However, his working relationship with the union allowed him to achieve more with his employees than many other supervisors. In 1997, Mitchell was also "plus-rated" to the position of acting superintendent. What this meant was that Mitchell filled in for the superintendent when the superintendent was not available and was paid at a higher hourly rate than his normal salary as a route supervisor.
 {¶ 7} When Mitchell became a route supervisor in 1994, Matti Seege, an African-American female, was the superintendent of the Waste Collection Division. Seege had been appointed in 1993, and had no prior experience in the waste collection division. Seege started with the City of Dayton as a typist trainee and did not have a college degree. She worked her way up though the ranks, and had been serving as superintendent of *Page 4 
water administration when she became superintendent of waste collection. Seege did not undergo an interview process with a panel before being recommended for the waste collection job. Instead, Seege discussed the job with Clarence Williams, an African-American male, who was the Director of Public Works. Williams recommended Seege for the job, and she was appointed after interviewing with the City Manager.
 {¶ 8} In the spring of 1998, Williams moved on to become clerk of the Dayton City Commission, and Dick Davis, a white male, was asked to become acting Director of Public Works. At that time, Seege was selected as acting Deputy Director of Public Works, which left a vacancy in the superintendent's position. After Seege and Davis were appointed to permanent positions in these jobs in August, 1998, Seege and Davis decided to give each of two supervisors a three-month trial as acting superintendent. At the end of the trial, Seege and Davis would recommend that the individual who had done the best job be appointed as superintendent. According to Davis, the tradition in Dayton was that if a director made a recommendation, the recommendation would be upheld and the candidate would be appointed.
 {¶ 9} The two supervisors selected for the trial were Mitchell, a white male, and Tederryl James, an African-American male. James went first and served as acting superintendent from October through December 31, 1998. Mitchell then served from the beginning of January, 1999, through March 31, 1999. At the end of the trial, both Seege and Davis felt that Mitchell had done a better job, and Davis recommended to the City Manager that Mitchell be appointed.
 {¶ 10} The City Manager at the time was Defendant-appellant Valerie Lemmie, an African-American female. Lemmie served as Dayton's City Manager between August, *Page 5 
1996, and March, 2002. Despite the recommendation, Lemmie did not appoint Mitchell as superintendent. Lemmie did not give Davis any reason why she did not appoint Mitchell to the position, nor did she say much of anything, other than that she was putting it off until she could make a decision. During this time, Seege asked Mitchell to continue in the position of acting superintendent. Mitchell continued in the position, at the "plus" rate, which amounted to about $50,000 per year. Mitchell's salary as a route supervisor at the time would have been about $45,000 per year. The pay for an acting superintendent was about 80% of the full-time position and was significantly less than what Mitchell would have received if he had been appointed to the position.
 {¶ 11} Nothing happened for some time. A posting for the superintendent's position then came out, and a national search was conducted. During this time, Lemmie never explained to Davis why she wanted a posting. When Davis asked Lemmie about Mitchell, Lemmie never gave him a reason why she did not want Mitchell for the position. Lemmie's testimony at trial was that she wanted "new blood," "new experiences," and "new ideas" for the position.
 {¶ 12} Davis was not on the interviewing committee for the search, but Seege was on the committee, along with two African-American males and another African-American female. Five or six people were interviewed, including Mitchell and James. However, Dayton lost, failed to preserve, or destroyed the resumes, rating sheets, and other documents pertinent to this search. Thus, the only available information about the ranking of the candidates came from the memory of Seege, who testified that Sarah Phillips, a white female from Kentucky, was ranked first, and Mitchell was ranked second. Seege could not recall information about the third candidate. The names of the top three *Page 6 
candidates were given to Lemmie.
 {¶ 13} Seege told Mitchell that one of the three would be chosen for the job, based on how well they did in the interview with Lemmie. Seege also told Mitchell before his interview that one candidate (a white male), was already out of the running. Mitchell was interviewed about a month after the other two candidates had been interviewed, and was given what Lemmie described in court as a "courtesy" interview. Mitchell testified that the wait outside Lemmie's office was longer than the interview, which lasted less than fifteen minutes.
 {¶ 14} Seege indicated that Phillips interviewed in September, 1999, and was offered the job over the telephone at some point. The usual practice before offering a job was to conduct a site visit. However, no site visit was made before this phone call. Phillips told Seege that she was not interested because she had already taken another job. Seege could not recall when the job offer was made.
 {¶ 15} In contrast, Mitchell testified that when he asked Seege about the job, he was first told that no decision had been made. He was then told that they were waiting to fill the job until after the November commission elections. And finally, Mitchell was told in November or early December, 1999, that they had decided to go with Phillips. Subsequently, Seege told Mitchell that Phillips had turned down the job. When Mitchell asked if he was going to get the job, because he was the only candidate left and had been told he was qualified, Seege said that no decision had been made yet. Seege then told Mitchell near the end of December, 1999, that another national search was going to be conducted and that he would not be getting the job.
 {¶ 16} In January, 2000, DMG Maximus was awarded a $129,000 contract to recruit *Page 7 
candidates for various available positions in the City of Dayton, including the waste superintendent job. This contract was based on discussions and negotiations before November 10, 1999. The contract documents indicate that an individual named Mike Casey would be doing the recruitment, and that Casey would be assisted by a self-employed consultant who "owns and operates a consulting service which offers specialized services in minority outreach and recruitment * * *." Ex. 20, Bates Stamp Number D-22630.
 {¶ 17} At the time, DMG Maximus was a corporate contributor to NFBPA and sponsored a scholarship that was advertised through NFBPA. The stated mission of NFBPA was a "commitment to strengthen the position of blacks within the field of public administration, to increase the number of blacks appointed to executive positions of public service organizations, and to groom and prepare young aspiring administrators for senior public management in the years ahead." Trial Transcript, Vol III, p. 309.
 {¶ 18} During the time that Lemmie was City Manager of Dayton, she served on the national board for NFBPA, as second vice-president and as secretary-treasurer. Lemmie was also an executive advisor to the local Dayton chapter of NFBPA, which included many City of Dayton employees as members. In 1999, the local chapter of NFBPA had 60 members, and three-fourths of the members were City of Dayton employees. According to the evidence, NFBPA dues were $150 per year, and the City paid dues for a number of City employees. Lemmie stated that as a member of NFBPA, she would necessarily have espoused its objectives and goals.
 {¶ 19} Mitchell continued as acting superintendent until the third week of January, 2000, when he was returned to his position of route supervisor, at his request. Mitchell's *Page 8 
request was based on several facts, including: that he made the bare minimum for the job by being "plus-rated"; that he took a lot of work home and worked extra hours; that he had been in the job for a year; and that Seege and Davis said he was not being considered for the job.
 {¶ 20} In January, 2000, Seege left the Department of Public Works to become acting director of Human Resources. Seege was then appointed as permanent Director of Human Resources, again without competing for the position.
 {¶ 21} The job posting for the superintendent's position listed the salary range as $48,734 — $67,018, depending on experience and qualifications. After the consultants interviewed candidates, several candidates were referred to a committee of city employees, who conducted video conferences. Both Davis and Seege were on the committee that rated the candidates. The characteristics upon which the candidates were rated were essentially the same as those used in the prior search, and they were looking for about the same thing in candidates. The position description for the waste collection superintendent had most recently been revised in 1989, before Lemmie became City Manager, and remained consistent during Lemmie's tenure, without any change.
 {¶ 22} In June, 2000, three candidates were video-interviewed: an African-American male, an African-American female, and a white male. The job was offered to the African-American male, John Johnson. The white male was withdrawn from consideration because he was allegedly not truthful about past elements of his career.
 {¶ 23} Davis expressed concern about the accuracy of the stated work experience of the African-American female, given her age. Lemmie did not recall Davis stating this, and said she rejected the female candidate because she did not meet the needs of the *Page 9 
organization. After a site visit was made to Columbus, where Johnson worked, Johnson was offered the job in June, 2000, at a proposed salary of $63,356.80. However, Johnson made a counteroffer and Dayton could not meet his salary requirements, so Johnson was not hired.
 {¶ 24} After Johnson failed to accept the position, resumes were not being collected and nothing was done for a while. At some point, a member of the NFBPA Board of Directors referred Celeste Peele, an African-American female and NFBPA member, to Lemmie. At the time, Peele was an assistant superintendent of waste collection in Virginia. Peele did not go through the Maximus process or any other competitive process, and no other candidates were presented as possibilities. Peele's resume was faxed to the City on August 7, 2000, and a committee of five persons, including Seege and Davis, interviewed Peele on August 11, 2000. Dayton was able to locate only one evaluation of these committee members; the others have been lost, were not preserved, or are missing.
 {¶ 25} Davis did not consider Peele to be comparable to Mitchell. Davis was concerned about Peele's apparent lack of knowledge of certain types of equipment, and expressed his concerns both to the committee and to Lemmie. Davis also did not believe that Peele was comparable to Mitchell, because Mitchell had better working knowledge of the operation and equipment.
 {¶ 26} During the interview, Peele told the committee that she had been disciplined for authorizing payment of overtime to individuals who may not have worked. After the interview, Seege flew to Virginia for a site visit. Seege talked to individuals about the overtime issue when she went to Virginia, and heard from one gentleman who felt the discipline had been in error. Therefore, Seege did not feel the disciplinary problem should *Page 10 
be of concern. On August 29, 2000, Peele was offered the job, at a starting salary of $65,000, and she accepted the offer. It was not Davis's decision to make an offer to Peele; he was instructed to do so by Lemmie. Peele began work in early October, 2000. Based on problems with his knees, Mitchell applied for and received disability retirement in March, 2001. Mitchell then filed suit in December, 2001.
 {¶ 27} Dayton adopted an Affirmative Action Plan (Plan) that was effective from 1984 to 2000. The Plan was offered as an exhibit at trial, but the trial court refused to admit it and did not consider it in ruling on the motion for directed verdict. The preamble of the Plan, signed by then City Manager, Richard Helwig, in November, 1984, indicates that the Plan was a "project initiated by the Municipal government of the City of Dayton, at the direction of the City Manager and with the support and commitment of the City of Dayton administration." Ex. 47(A), Bates Stamp 20128.
 {¶ 28} The Plan states that:
 {¶ 29} "This Plan holds as its basic premise that, to be truly responsible to the community we serve, municipal government must first affirmatively exercise the practice of equal employment opportunity in each of its agencies and departments throughout all levels of the organizational structure of the government.
 {¶ 30} "The implementation of this Affirmative Action Plan is therefore intended to achieve an objective which is clearly stated, and universally applies to all agencies and departments of the municipal organization:
 {¶ 31} "BY JANUARY 1, 2000, THE CITY OF DAYTON MUNICIPAL GOVERNMENT WILL EMPLOY A WORKFORCE WHICH REFLECTS THE DEMOGRAPHIC COMPOSITION OF THE POPULATION, WORKING OR SEEKING *Page 11 
EMPLOYMENT, OF THE CITY OF DAYTON.
 {¶ 32} "THE PLAN WILL BEGIN IMMEDIATELY, AND EVERY DEPARTMENT, DIVISION AND AGENCY WILL MAKE SIGNIFICANT PROGRESS EACH YEAR OF THE PLAN." Id. (Capitalization in original.)
 {¶ 33} The Plan analyzed the general workforce and municipal workforce, but addressed only four demographic categories: (1) white males; (2) white females; (3) minority males; and (4) minority females. Categories of workers were also divided into white collar, blue collar, and clerical.
 {¶ 34} The Plan observed that "Dayton's predominant minority group is its sizeable Black population, and a successful Affirmative Action Plan will have to address the employment and retention of Black employees." The Plan noted that Dayton's first affirmative action plan was adopted in 1977, and minority employees had actually decreased, and female employees had only slightly increased, in the seven years thereafter. Women were significantly underutilized on blue collar and white collar levels, and were extremely overutilized on the clerical level. Similarly, black and minority employees were underutilized on the blue collar level, and extremely underutilized on the white collar level.
 {¶ 35} Under "Selection and Personnel Practices," the Plan states that:
 {¶ 36} "While no applicant should ever be accepted or rejected for employment or promotion based solely on race or gender, the City recognizes Affirmative Action as a moral and legal responsibility. The race or sex of an applicant is a legitimate factor to be considered in selecting appointees to positions where certain demographic categories are underutilized from a group of candidates with nearly equal qualifications." Id. at D-20139. *Page 12 
 {¶ 37} The Selection and Personnel Practices section of the Plan requires development of a comprehensive reporting system, and mandates that the City Manager, department directors, and division managers develop an annual workplan each year. Furthermore, the Plan states that:
 {¶ 38} "Each department director will have affirmative action objectives as a component of his or her performance contract; these objectives will represent a minimum of 10% of each executive's performance evaluation."
 {¶ 39} Departments with the poorest record of utilization of female, black, and other minority employees were to be prioritized for "intensive involvement," which would include various measures designed to provide suitable applicants for vacancies. In addition, the Plan mandates that:
 {¶ 40} "The City Manager will make a weekly review of vacant positions which are underrepresented. Each department or office will have its Affirmative Action `batting average' computed on a current basis. Each personnel requisition which represents an underrepresented employment position will be clearly indicated as such and the originating department must take responsibility for addressing that issue, with, among other elements, a proposed recruiting plan." Id. at D-20140.
 {¶ 41} Each department was given yearly objectives, which were to be included in the performance contract of each department director. These objectives were computed by a specific method, based on the percentages of African-Americans and women in the total general workforce of the City of Dayton (37% and 46%, respectively). After outlining the set objectives, the Plan discusses each City Department individually, including statistics about the current and future minority and female representation in each category of work. *Page 13 
 {¶ 42} With regard to the Department of Public Works, the Plan notes the following representation of race and gender in 1984: 379 total employees, 111 of those minority, and 25 female. Of 70 white collar employees, seven were African-American (10%) and three were female (4.3%). The stated objective for the year 2000 was to have 379 total employees, with 140 being minority employees and 174 being female employees. Of the white collar employees, 28 were to be minority (37%) and 32 were to be female (46%) by 2000. In order to achieve this objective, the Plan called for specific increases each year. For example, in the year 1988, the objective was an increase of one white collar minority employee and two female white collar employees. Similar increases were to occur over the remaining years up through the year 2000.
 {¶ 43} The formula used to calculate the number of minorities and females in the workforce was based solely on demographic information from the U.S. Census Bureau, with the terms "population, working or seeking employment" and "general workforce" to mean:
 {¶ 44} "all persons living in the city of Dayton ages 16 and over who are either:
 {¶ 45} "1. employed, full or part-time
 {¶ 46} "2. unemployed (i.e., eligible for Unemployment Compensation)
 {¶ 47} "3. actively seeking work, or
 {¶ 48} "4. not actively seeking work, but would accept a job if offered." Id. at D-20163.
 {¶ 49} The Plan included a section on non-discrimination, and stressed that qualified individuals would not be discriminated against based on "age, race, religion, color, sex, national origin, ethnic heritage, sexual orientation, political affiliation, veteran status, or *Page 14 
handicap." Finally, the Plan concluded by stating that:
 {¶ 50} "All individuals who have input into the selection process will become familiar with the Affirmative Action and Non-Discrimination policies of the City and taken [sic] an active role in their support. The management of the City is fully committed to both and will review progress regularly in all departments, divisions, and agencies of the City of Dayton." Id. at D-20165.
 {¶ 51} At trial, Lemmie admitted that the Plan was in effect as part of city policies while she was City Manager. However, Lemmie denied being given any instructions about diversity by the City Commission, other than with regard to the police and fire departments.
 {¶ 52} In December, 2001, Mitchell filed a lawsuit against Dayton, Lemmie, and other city officials, alleging race and gender discrimination. The case was voluntarily dismissed without prejudice in January, 2004. Mitchell then filed the present case, again alleging race and gender discrimination, in April, 2004. In February, 2006, the trial court directed a verdict in favor of the City of Dayton and Lemmie at the conclusion of Mitchell's case. From this adverse judgment, Mitchell appeals.
 II {¶ 53} Mitchell's First Assignment of Error is as follows:
 {¶ 54} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING APPELLANT'S MOTIONS TO AMEND AND SUPPLEMENT THE COMPLAINT, LEAVE TO SERVE ADDITIONAL INTERROGATORIES WHERE BOTH MATTERS WERE ASSOCIATED WITH DESTRUCTION OF RECORDS OF THE APPLICANT POOL, THEIR RATINGS, AND OTHER RELEVANT MATTERS IN *Page 15 
VIOLATION OF A MUNICIPALITY'S DUTY PURSUANT TO R.C. 149.39 AND A LITIGANT'S DUTY TO PRESERVE EVIDENCE AND COURT ORDERS."
 {¶ 55} Under this assignment of error, Mitchell contends that Dayton failed to preserve records in violation of both statutory and common law requirements prohibiting willful or negligent destruction of evidence. Mitchell further contends that the trial court erred in refusing to allow additional interrogatories directed to the matter of missing evidence, and in refusing to allow the complaint to be amended or supplemented with regard to these matters.
 {¶ 56} As was noted, Mitchell's original case was filed in December, 2001, about fourteen months after Peele was hired, and less than two years after the bulk of the events pertinent to the promotion process. The documents below indicate that little discovery appears to have been conducted before the original action was dismissed in early 2004. The current action was then filed a few months later, in April, 2004, and thirty-three interrogatories were attached to the complaint. Among other things, the interrogatories requested information about the selection process. Mitchell also attached twenty-six requests for production of documents to the complaint, and asked for copies of various documents, including all documents used in compiling the answers to the interrogatories.
 {¶ 57} Subsequently, in July, 2004, Mitchell filed a motion to compel, indicating that he needed interview committee records and other documents in order to conduct depositions and proceed with the case. In October, 2004, Mitchell filed a second motion to compel, stating that he had agreed to withdraw the prior motion on condition that the discovery would be provided in September, 2004. In November, 2004, Defendants filed a notice indicating that they had submitted responses to the first set of interrogatories. *Page 16 
 {¶ 58} Mitchell filed a third motion to compel in June, 2005, as well as motions to impose sanctions and for leave to file an amended and supplemental complaint for tortious interference with evidence (spoliation). In these motions, Mitchell explained that he did not receive any discovery responses until January, 2005. Upon discovering that Defendants had failed to provide about 200 documents that were referenced in the discovery responses, Mitchell sent a letter to Defendants asking for the missing documents. However, when the Defendants submitted these documents to Mitchell in May, 2005, the documents allegedly did not cure the discovery issues.
 {¶ 59} In the motion, Mitchell noted that the Defendants had suggested that documents had been destroyed or were missing. Mitchell, therefore, asked the court for permission to serve interrogatories in order to investigate the spoliation issue. Mitchell also asked for permission to file a supplemental and amended complaint, for the purposes of raising a spoliation claim. Two days after the motion was filed, and before Defendants had even responded, the trial court denied Mitchell's request to serve additional interrogatories. The court did not provide any reasons for the denial.[1]
 {¶ 60} Mitchell filed a fourth motion to compel in late July, 2005, regarding discovery related to statistical evidence that would allegedly prove a pattern of discrimination in the waste collection department. The trial court then filed a decision in August 2005, sustaining the first, second, and third motions to compel in part. The court granted the motions insofar as they related to production of documents, and ordered Dayton to provide *Page 17 
complete copies of all interview and ratings sheets, including all pages and comment pages, a master list of all applicants who applied for, interviewed for, or were considered for the waste superintendent position, a complete copy of the records retention schedule for the human resources department, and all documents relating to the NFBPA. The court filed an identical decision covering the same issues in September, 2005.
 {¶ 61} In October, 2005, Mitchell filed a fifth motion to compel, as well as a request for reconsideration of the court's decision on the previous motions to compel. In the motion, Mitchell pointed out that although the court had ordered disclosure of interview documents, hundreds of pages of documents had not been produced and had apparently "disappeared." Mitchell again asked the court to allow him to amend or supplement the complaint to allege a spoliation claim.
 {¶ 62} In November, 2005, Mitchell deposed various Dayton employees, who had been requested to bring documentation on various subjects, including all records regarding the position of superintendent of waste collection from 1997 through 2002, all records regarding the rating or evaluation of candidates for the superintendent's position, and all records regarding recruitment of minority candidates for the City of Dayton. In December, 2005, Mitchell filed partial excerpts of those employees, claiming that the depositions indicated that the employees had not made appropriate searches for records.
 {¶ 63} Subsequently, in January, 2006, Mitchell filed two more memoranda in support of his fifth motion to compel. At that point, the trial of the case was scheduled to begin on January 30, 2006. The court, however, had not yet ruled on the motion to compel that had been pending since October 2005. The court also had not ruled on the motion to amend or supplement the complaint, which had been pending since June 2005. *Page 18 
 {¶ 64} Mitchell asked the court to impose various sanctions, including an award of deposition expenses, an order prohibiting Defendants from presenting certain evidence, and jury instructions about missing evidence. One issue involved the deposition of Sarah Phillips, the white female who had allegedly been offered a job in November or December, 1999. Phillips had insisted in her deposition that she had never interviewed for a position with the City of Dayton, had never been to Dayton before 2004 (when she came to Dayton on an unrelated matter), and had never been offered the position of waste superintendent for Dayton.
 {¶ 65} For some reason, the trial court filed an order on January 20, 2006, granting the motions to compel that had already been granted in August and September, 2005 (the second, third, and fourth motions to compel). This entry was identical to the entries that had previously been filed.[2] The trial court filed a second order on January 20, 2006, finding the fifth motion to compel discovery well-taken in part. The court ordered Dayton to answer various interrogatory questions and to comply with certain document requests within fourteen days of the order. Notably, this means that the responses would not have been due until after the start of trial.
 {¶ 66} The trial court also granted Mitchell's request for leave to submit and serve additional interrogatories on Defendants. Presumably, this was related to spoliation, as that is the only request that appears in the file. As we mentioned, the trial court had *Page 19 
previously denied that request. As with the order on the motion to compel, the trial court gave Mitchell leave to serve interrogatories, but did not allow time for the interrogatories to be answered before trial. At that point, the trial was only ten days away.
 {¶ 67} On January 20, 2006, Mitchell filed a supplemental motion for leave to amend the complaint and/or to present evidence at trial regarding spoliation. In support of the motion, Mitchell noted that various items of evidence were missing, including: (1) cover letters and resumes of candidates who applied, had interviewed or were considered; (2) acknowledgment letters pertaining to these candidates; (3) scoring or rating sheets for candidates; and (4) Lemmie's electronic appointment book. Mitchell claimed prejudice due to the lack of written documentation.
 {¶ 68} Previously, in mid-January, 2006, Mitchell had filed a supplement to his fifth motion to compel. In this supplement, Mitchell outlined various factors pointing to spoliation of evidence, including the fact that Dayton kept all relevant documentation, including cover letters and resumes relating to appointment of an assistant fire chief during the same time period as the hiring of the waste superintendent. However, Dayton could not "find" many documents relating to the promotion and hiring decisions in the present case.
 {¶ 69} Mitchell further noted that he had been asking for Lemmie's electronic appointment book since 2003, when Lemmie was deposed during the original action. However, Lemmie had stated in her deposition that she did not know if Dayton kept a record of what occurred during her tenure. Dayton had also represented during a 2005 discovery hearing that Lemmie's electronic notebook did not exist and could not be produced. However, when Mitchell reviewed documents that Dayton provided during the *Page 20 
first week of January, 2006, Mitchell discovered a copy of a city official's appointment book and a printout of a city official's Microsoft outlook calendar. Based on these practices, which differed from what occurred in the present case, Mitchell argued that Dayton did maintain records of Lemmie's appointments, and about hiring for the waste superintendent position, but had intentionally destroyed the information.
 {¶ 70} We also note that the first set of interrogatories enclosed with the complaint in 2004 required Defendants to identify all candidates for the position of waste superintendent from March 1, 1998 through November 1, 2000, and to provide copies of all documents identifying candidates. The interrogatories also asked for identification of all expenses associated with filling the position of waste superintendent, and for the identity of all persons who were scheduled for interviews or who interviewed with Lemmie for the position, together with the dates of the interviews, and the time, length, and result of the interview. The request for production of documents, which was also filed with the complaint, asked for production of all documents that were referenced or consulted in answering the interrogatories.
 {¶ 71} Besides indicating that no electronic copy of Lemmie's appointment book had been found, Dayton represented on various occasions that it had produced all the documents that it could find regarding this case. However, a week before trial, Dayton faxed documents to Mitchell regarding Sarah Phillips, who had been deposed on January 13, 2006. As was indicated, Phillips testified that she had not interviewed in Dayton and had not been offered a job. This contradicted the testimony of both Lemmie and Seege.
 {¶ 72} The "new" documents that Dayton faxed to Mitchell were: (1) an itinerary showing a flight for Phillips from Paducah, Kentucky to Dayton on September 2, 1999, and *Page 21 
a return flight to Paducah the following day; (2) a September 3, 1999 request for reimbursement to Phillips for airfare to interview for the position of Waste Management Collection Manager; and (3) a copy of a check from Dayton, made out to Phillips. The check was dated September 3, 1999. Subsequently, on January 27, 2006, Defendants sent Mitchell another "new" piece of evidence — a copy of the back of the check, which bore Phillips's endorsement.
 {¶ 73} After receiving the most recent piece of evidence, Mitchell filed a motion for a continuance. The court never expressly ruled on the motion, but it was obviously denied, since the trial began as scheduled. On the second day of trial, the court overruled Mitchell's motion to amend the complaint, stating, without discussion, that Mitchell had failed to make a prima facie showing of a spoilation claim.
 {¶ 74} In Davis v. Wal-Mart Stores, Inc. 93 Ohio St.3d 488, 491,2001-Ohio-1593, 756 N.E.2d 657, the Ohio Supreme Court stressed that "claims for spoliation of evidence may be brought after the primary action has been concluded only when evidence of spoliation is not discovered until after the conclusion of the primary action." For purposes of the present case, this means that Mitchell had to bring his claim prior to trial, because the alleged evidence of spoliation was discovered during the primary action. Mitchell did not have the option of waiting until after the primary action was concluded.
 {¶ 75} "The grant or denial of leave to amend a pleading is discretionary and will not be reversed absent an abuse of discretion." * * * `An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable.'" State ex rel. Askew v. Goldhart,75 Ohio St.3d 608, 610, 1996-Ohio-448, 665 N.E.2d 200 (citations omitted). Further, while Civ. R. 15 allows for liberal amendment, courts may deny motions to amend *Page 22 
where there is a showing of bad faith, undue delay, or undue prejudice to the opposing party. Turner v. Cent. Local School Dist.,85 Ohio St.3d 95, 99, 1999-Ohio-207, 706 N.E.2d 1261.
 {¶ 76} The trial court in the present case failed to make findings regarding its decision, other than its statement regarding the lack of aprima facie claim of spoliation. As a result, we are left to guess at the court's reasoning. Our own review of the record does not reveal bad faith on Mitchell's part, nor do we find that Dayton would have been unduly prejudiced, since the original request to amend was filed more than six months before the scheduled trial and well before the discovery cut-off. We also do not find evidence of undue delay. The case was filed in April, 2004, and discovery requests were served with the complaint. Mitchell filed several motions to compel Dayton to answer these requests, and the court sustained the motions in part several times. The last motion to compel was filed in October, 2005, several months before trial. However, the trial court waited until the eve of trial to compel Dayton to produce discovery that had been requested nearly two years earlier.
 {¶ 77} Dayton contends that the trial court did not err in refusing to allow amendment because Mitchell did not establish a prima facie case of spoliation. In this regard, Dayton contends that it had no duty to keep records of resumes and rating sheets of candidates involved in the promotional process, particularly after the hiring process was completed. Dayton claims, therefore, that the failure to preserve records could not be willful or intentional. In addition, Dayton contends that the lack of records did not prevent Mitchell from going forward to trial, since the racial makeup of the candidates was not disputed. *Page 23 
 {¶ 78} The Ohio Supreme Court has outlined the following elements of a claim for interference with, or destruction of, evidence:
 {¶ 79} "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts * * *."Smith v. Howard Johnson Co., Inc., 67 Ohio St.3d 28, 29, 1993-Ohio-229,615 N.E.2d 1037.
 {¶ 80} Dayton is correct in claiming that a trial court may deny amendment where the plaintiff fails to provide prima facie support for the new matters to be pleaded. The Ohio Supreme Court did make this general statement in Wilmington Steel Products, Inc. v. Cleveland Elec.Illum. Co. (1991), 60 Ohio St.3d 120, 573 N.E.2d 622, syllabus. However, the Ohio Supreme Court subsequently clarified Wilmington Steel, stating that:
 {¶ 81} "In considering a plaintiff's request for leave to amend, `a trial court's "primary consideration is whether there is actual prejudice to the defendants because of the delay."' * * * Although we have held in a case involving the assertion of a new claim against an existing defendant that the plaintiff must make "`at least a prima facie showing [of] support for the new matters sought to be pleaded,'" that consideration is meant to aid in determining whether the amendment is "`simply a delaying tactic, [or] one which would cause prejudice to the defendant.'"'" Darby v. A-Best Products Co., 102 Ohio St.3d 410, 414,2004-Ohio-3720, 811 N.E.2d 1117, at ¶ 20 discussing Wilmington SteelProducts, 60 Ohio St.3d at 122, 573 N.E.2d 622 (other citations omitted).
 {¶ 82} As we noted, there is no evidence that the motion to amend was a delaying tactic. We are also troubled by various trial court rulings that appear arbitrary, or at least *Page 24 
are unsupported by a sound reasoning process. See Schafer v. RMSRealty (2000), 138 Ohio App.3d 244, 300, 741 N.E.2d 155, citing AAAAEnterprises, Inc. v. River Place Community Urban RedevelopmentCorp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601 ("Decisions are unreasonable if they are not supported by a sound reasoning process.") The rulings in question include: the trial court's denial of Mitchell's motion for leave to serve interrogatories, which was filed before Defendants had even responded to Mitchell's motion; the trial court's subsequent grant of a motion to compel and leave to file interrogatories on the eve of trial, when responses would not be obtained before trial; and the trial court's failure to provide a hearing on the motion to amend or to specifically discuss why the amendment would not be allowed. Compare Scrivner v. Ohio Dept. of Rehab. Corr, Franklin App. No. 04AP-352, 2005-Ohio-1843, at ¶ 4-5 (shortly before trial, plaintiff files motion to amend to include spoilation claim. Trial court holds ruling on motion in abeyance and allows plaintiff to present evidence regarding spoliation at trial). See also,Boggs v. The Scotts Co., Franklin App. No. 04AP-425, 2005-Ohio-1264, atIf 6. (Trial court grants leave to amend complaint to allege spoliation, although court does ultimately grant summary judgment on this claim as well as on all claims of the plaintiff).
 {¶ 83} We are also troubled by the fact that documentary evidence suddenly surfaced a few days before trial. Dayton answered interrogatory answers in November, 2004, and identified Sarah Phillips as the person who had been offered the job. Since Mitchell's previously filed request for production of documents had included documents of expenses associated with interviews and dates of interviews, Phillips' itinerary and reimbursement records should have been disclosed. These documents would have been particularly helpful, since Lemmie and Seege were vague on details and even on the *Page 25 
general time frame when Phillips had interviewed.
 {¶ 84} This vagueness, in turn, led Mitchell to conclude that the entire "job offer" scenario was fabricated to cover discriminatory intent. Mitchell finally tracked Phillips down, and found out after taking her deposition that Phillips denied interviewing for the job, denied being in Dayton, and denied being offered a job. Suddenly, after Phillips's deposition, documents materialized showing that Phillips had, indeed, been in Dayton. Notably, the documents appeared within a few days of the scheduled trial, leaving Mitchell with no reasonable ability to pursue how these documents were found and why they were not disclosed earlier.
 {¶ 85} We conclude that the trial court abused its discretion in refusing to allow Mitchell to amend the complaint, in ordering discovery that was not due until after trial began, and in failing to order a continuance of the trial or some other remedial measure.
 {¶ 86} Mitchell has also raised the issue of whether Dayton failed to comply with R.C. 149.351(A), which prohibits public offices from destroying or disposing of public records except as provided by law. In response, Dayton contends that Mitchell failed to set forth evidence that the records in question were "public records" as defined by R.C.149.39, or that the records were required to be kept pursuant to Dayton's record retention policies.
 {¶ 87} Because the trial court rejected the attempt to amend or supplement the complaint, discussion about evidentiary matters that might be litigated is premature. We do note, however, that R.C. 149.39
does not define the term "public records"; it simply establishes records commissions for municipal corporations that are to adopt rules for retention and disposal of records. The definition of public records can be found in R.C. *Page 26 149.011(G), which provides that a public record is:
 {¶ 88} "any document, device, or item, regardless of physical form or characteristic, including an electronic record as defined in section1306.01 of the Revised Code, created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office."
 {¶ 89} The Ohio Supreme Court recently adopted a broad interpretation of "public records" in a case involving overtime claims of employees of the City of Akron. In answering certified questions from the Sixth Circuit Court of Appeals, the Ohio Supreme Court stressed that:
 {¶ 90} "Public records are one portal through which the people observe their government, ensuring its accountability, integrity, and equity while minimizing sovereign mischief and malfeasance. * * * Public records afford an array of other utilitarian purposes necessary to a sophisticated democracy: they illuminate and foster understanding of the rationale underlying state decisions, * * * promote cherished rights such as freedom of speech and press, * * * and `foster openness and * * * encourage the free flow of information where it is not prohibited by law.'" Kish v. Akron, 109 Ohio St.3d 162, 166, 2006-Ohio-1244,846 N.E.2d 811, at If 16 (citations omitted).
 {¶ 91} The court went on to state that:
 {¶ 92} "We previously have held that the General Assembly's use of `includes' in R.C. 149.011(G) as a preface to the definition of `records' is an indication of expansion rather than constriction, restriction, or limitation and that the statute's use of the phrase `any document' is one encompassing all documents that fit within the statute's definition, *Page 27 
regardless of `form or characteristic' * * * There can be no dispute that there is great breadth in the definition of `records' for the purposes here. Unless otherwise exempted or excepted, almost all documents memorializing the activities of a public office can satisfy the definition of `record.' * * * Indeed, any record that a government actor uses to document the organization, policies, functions, decisions, procedures, operations, or other activities of a public office can be classified reasonably as a record. * * * So can any material upon which a public office could rely in such determinations. * * * The document need not be in final form to meet the statutory definition of `record.'"2006-Ohio-1244 at ¶ 20 (citations omitted) (italics in original).
 {¶ 93} As the court also stressed in Kish, "the people's right to know includes `not merely the right to know a governmental body's final decision on a matter, but the ways by which those decisions were reached.'" Id. at ¶ 26. This would include hiring and promotion decisions of a governmental body.
 {¶ 94} We note that Mitchell originally filed suit within about ten months after he left Dayton's employment, and less than two years after most of the relevant events involved in the litigation. Dayton, therefore, would have known at that time that records should be preserved. Under the circumstances, we find that the trial court abused its discretion in refusing to allow Mitchell to amend or supplement the complaint to include spoliation and public records claims. We express no opinion as to the ultimate merits of any such claims.
 {¶ 95} Mitchell's First Assignment of Error is sustained.
 III {¶ 96} For purposes of convenience, our discussion will combine the second and *Page 28 
third assignments of error. Mitchell's Second Assignment of Error is as follows:
 {¶ 97} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY NOT AFFORDING APPELLANT THE BENEFIT OF THE PRESUMPTIONS ASSOCIATED WITH MISSING EVIDENCE AND REFUSING TO CONSIDER THE CITY'S AFFIRMATIVE ACTION PLAN, ISSUES ASSOCIATED WITH THE NFBPA, THE HISTORICAL PLACEMENT OF BLACKS IN THE SUPERINTENDENT POSITION, NOT ALLOWING COMPARISON OF CANDIDATES OR THEIR JOB PERFORMANCE AND IN FAILING TO ISSUED [SIC] SANCTIONS OR GRANT A CONTINUANCE."
 {¶ 98} Mitchell's Third Assignment of Error is as follows:
 {¶ 99} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY GRANTING DEFENDANTS A DIRECTED VERDICT."
 {¶ 100} Under these assignments of error, Mitchell contends that the trial court erred in refusing to consider certain evidence and evidentiary presumptions in ruling on the motion for directed verdict. Mitchell also contends that the court erred in granting the directed verdict. The evidence the court failed to consider or admit includes: Dayton's Affirmative Action Plan; exhibits and evidence about NFBPA; records of NFBPA dues paid by the City; historical practices in the waste collection department; and comparisons between the performance of Mitchell and that of the chosen candidate, Peele. We will consider these matters in the context of whether the court erred in directing a verdict in favor of Lemmie and Dayton.
 {¶ 101} "Motions for directed verdict test the legal sufficiency of evidence, not its weight or the credibility of witnesses. As a result, our review of the lower court judgment is de novo." Schafer,138 Ohio App.3d at 257. In evaluating whether a directed verdict is *Page 29 
merited, the court decides if "`there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is directed]. * * * A motion for a directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.'" Id. at 257-58 (citation omitted).
 {¶ 102} The present case was brought as a race and gender discrimination claim under R.C. 4112.02. Employees pursuing discrimination claims under R.C. 4112.02 may prevail by presenting either direct or indirect evidence to prove that the employer was motivated by improper animus when it took the challenged employment action. Grooms v. Supporting Council of Preventative Effort,157 Ohio App.3d 55, 62, 2004-Ohio-2034, 809 N.E.2d 42, at If 20. "Direct evidence" in the context of discrimination claims "does not refer to whether evidence is direct or circumstantial in the ordinary evidentiary sense in which we normally think of those terms. Instead, `direct evidence' refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination." Bass v.Board of County Commrs, Orange County, Fla. (C.A.11, 2001),256 F.3d 1095, 1111.
 {¶ 103} In Bass, the Eleventh Circuit Court of Appeals considered the effect of an affirmative action plan in the context of a "reverse discrimination" case, noting that the defendant had attempted to distance itself from the plan, while the plaintiff had relied on it. Id. at 1109. Similarly, Lemmie claimed that she had not been instructed to use Dayton's Plan or to develop strategies around diversity city-wide, and Mitchell attempted to rely on the Plan as proof of discriminatory intent. The trial court refused to admit the Plan into evidence, and did not consider it in any way in ruling on the motion for directed verdict.
 {¶ 104} The Eleventh Circuit indicated in Bass that the mere existence of an *Page 30 
affirmative action plan by itself does not constitute discrimination. The Eleventh Circuit went on to note, however, that:
 {¶ 105} "the existence of an affirmative action plan, when combined with evidence that the plan was followed in an employment decision, is sufficient to constitute direct evidence of unlawful discrimination unless the plan is valid. * * * Furthermore, even when a defendant denies having acted pursuant to its affirmative action plan, if there is evidence that it may have done so, a jury must decide whether the defendant in fact acted pursuant to its stated plan. See Messer v.Meno, 130 F.3d 130, 139 (5th Cir.1997) (finding that jury could conclude that defendant acted pursuant to affirmative action plan in light of circumstantial evidence even though defendant denied having taken plan into account). When a jury finds that a government employer acted pursuant to an affirmative action plan, then the employer should be held liable for discrimination unless the plan is valid under Title VII and the Equal Protection Clause. * * * This is because, regardless of good intentions, a government employer commits unlawful discrimination when it takes race into account in an employment decision and acts pursuant to an invalid affirmative action plan." Id. at 1110 (citations and footnotes omitted).
 {¶ 106} The Eleventh Circuit stressed in Bass that it did not believe "the status of evidence as `direct' in this context * * * changes simply because a defendant contests the validity of the evidence, thereby requiring the plaintiff to offer proof related to the disputed evidence through other means. Therefore, an affirmative action plan may constitute direct evidence, even when a defendant denies having acted pursuant to its stated plan." Id. at 1111. In explaining why an affirmative action plan would be considered direct evidence, the Eleventh Circuit noted that: *Page 31 
 {¶ 107} "Statements by decisionmakers clearly evincing discriminatory intent and obviating the need to rely on an inference of discrimination constitute direct evidence of discrimination. * * * In principle, an affirmative action plan is exactly such a statement. The only thing to distinguish an affirmative action plan from any other discriminatory statement (other than the degree of formality involved) is that the discrimination it describes or prescribes is permissible if the plan is valid under Title VII and the Equal Protection Clause. If it is not valid, an affirmative action plan amounts to nothing more than a formal policy of unlawful discrimination." Id. at 1111, n. 7 (citation omitted).
 {¶ 108} As we noted, Dayton's affirmative action plan was in effect during the time the decision-making occurred in the present case. Although Lemmie denied being instructed to implement the Plan, the Plan itself requires substantial participation and implementation by the City Manager, including development of an annual workplan, and most significantly,
 {¶ 109} "a weekly review of vacant positions which are underrepresented."
 {¶ 110} As an additional matter, Mitchell presented evidence indicating that Lemmie acted pursuant to the Plan, despite her denials. The original "competition" for the job was between a white male and an African-American male. According to Mitchell's evidence, the recommendation of the department head (in this case, Davis), had traditionally been upheld. However, that tradition was not followed in the present situation, when the chosen candidate for promotion was a white male. Again, crediting Mitchell's evidence (and not weighing the evidence), as is required in ruling on a Civ. R. 50 motion, neither Mitchell nor Davis were told why the traditional method was not followed. Lemmie testified that she went "outside" because she wanted "new blood" and "innovative ideas." *Page 32 
However, if this were the aim, then there was no point in having a competition between internal candidates,
 {¶ 111} Without repeating all the evidence outlined above, we conclude that the evidence in the record would allow a jury reasonably to conclude that Dayton and Lemmie acted pursuant to Dayton's affirmative action plan, despite Lemmie's denial. Bass, 256 F.3d at 1113. This evidence includes: failure to follow traditional hiring procedures; inconsistency in implementation of the hiring process, such as appointment of other promotional candidates without competition, while the waste superintendent position was subjected to several competitions and searches; Lemmie's failure to articulate reasons to Davis or Seege for refusing to promote Mitchell; Lemmie's membership and leadership position in an organization designed to increase the number of African-Americans as public service executives; Dayton's financial support of employee membership in NFBPA; and the fact that during Lemmie's tenure, only African-American and females were sent to executive and leadership training at the Executive Leadership Institute and the Leadership America Institute. In this regard, we note that Mitchell's claims did not just involve racial discrimination — gender discrimination was alleged as well. Therefore, the fact that the job was first offered to a white female does not establish lack of discriminatory intent.
 {¶ 112} Based on the preceding discussion, we conclude that the trial court erred in refusing to admit Dayton's affirmative action plan into evidence, and further erred in failing to consider the Plan's effect in connection with the motion for a directed verdict. In Bass, the court noted that upon proof that an employer has acted pursuant to an affirmative action plan, the question becomes whether the plan is valid under Title VII (or in the present case, under R.C. 4112.02).256 F.3d at 1113. *Page 33 
 {¶ 113} In Johnson v. Transportation Agency, Santa Clara County,Cal. (1987), 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615, the United State Supreme Court considered whether an affirmative action plan for hiring and promoting women and minorities that had been voluntarily adopted by a transportation agency violated Title VII. According to the court, the first issue in such situations is whether consideration of race or sex is justified by the existence of a "manifest imbalance" that reflects under-representation of women or minorities in traditionally segregated job categories. 480 U.S. at 631.[3] The Supreme Court noted that:
 {¶ 114} "in determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise * * *. Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications. See HazelwoodSchool District v. United States, 433 U.S. 299, 97 S.Ct. 2736,53 L.Ed.2d 768 (1977) (must compare percentage of blacks in employer's work ranks with percentage of qualified black teachers in area labor force in determining underrepresentation in teaching positions)."480 U.S. at 631-32
 {¶ 115} As a benchmark for measuring progress, the plan inJohnson adopted *Page 34 
a long-term goal that the major job classifications in the workforce would mirror the percentage of women in the local labor market. However, the plan acknowledged that:
 {¶ 116} "such a figure could not by itself necessarily justify taking into account the sex of applicants for positions in all job categories. For positions requiring specialized training and experience, the Plan observed that the number of minorities and women `who possess the qualifications required for entry into such job classifications is limited.' * * * The Plan therefore directed that annual short-term goals be formulated that would provide a more realistic indication of the degree to which sex should be taken into account in filling particular positions. * * * The Plan stressed that such goals `should not be construed as "quotas" that must be met,' but as reasonable aspirations in correcting the imbalance in the Agency's work force. * * * These goals were to take into account factors such as `turnover, layoffs, lateral transfers, new job openings, retirements and availability of minorities, women and handicapped persons in the area work force who possess the desired qualifications or potential for placement.' * * * The Plan specifically directed that, in establishing such goals, the Agency work with the County Planning Department and other sources in attempting to compile data on the percentage of minorities and women in the local labor force that were actually working in the job classifications constituting the Agency work force. * * * From the outset, therefore, the Plan sought annually to develop even more refined measures of the underrepresentation in each job category that required attention." Id. at 635. In this regard, the Supreme Court stressed that:
 {¶ 117} "By contrast, had the Plan simply calculated imbalances in all categories according to the proportion of women in the area labor pool, and then directed that hiring be governed solely by those figures, its validity fairly could be called into *Page 35 
question. This is because analysis of a more specialized labor pool normally is necessary in determining underrepresentation in some positions. If a plan failed to take distinctions in qualifications into account in providing guidance for actual employment decisions, it would dictate mere blind hiring by the numbers, for it would hold supervisors to `achievement of a particular percentage of minority employment or membership. . . regardless of circumstances such as economic conditions or the number of available qualified minority applicants. . . .'" * * * Id. at 636 (citation omitted).
 {¶ 118} Unlike the plan in Johnson, Dayton's Plan fails to acknowledge that imbalance cannot, in itself, justify taking race or sex into consideration. Also unlike the plan in Johnson, Dayton's Plan calculates imbalances based solely upon the respective proportion of African-Americans and women in the local labor force (37% and 46%, respectively), not upon the proportion of skilled workers.
 {¶ 119} In discussing white collar employees, Dayton's Plan points out that many positions are supervisory and others require educational or experience prerequisites. Ex. 47(A), Bates Stamp D-20163. However, the Plan makes no provision, at its initiation or later, for determining what percentage of such individuals actually exists in the labor market. Dayton's Plan does provide for annual recomputation of yearly objectives. However, unlike the plan in Johnson, Dayton's recomputation has nothing to do with an analysis of minorities or women who have the desired qualifications for skilled positions. Instead, Dayton's recomputation is based on "adjustments for the previous year's progress, total number of employees in the department, and changes (if any) in the demographic composition of the overall workforce." Id. at D-20142.
 {¶ 120} In view of this failure of Dayton's Plan, we need not consider the other *Page 36 
issues outlined in Johnson, which include whether the plan unnecessarily trammels the rights of male employees or creates "an absolute bar to their advancement," and whether the plan is designed to "attain" a balance, "not to maintain one." 480 U.S. at 637-639. As structured, Dayton's Plan dictates "mere blind hiring by the numbers." Id. at 636.
 {¶ 121} We note that some courts consider affirmative action plans as indirect, rather than direct evidence of discrimination. See, e.g.,Tevlin v. Metropolitan Water Reclamation Dist. of Greater Chicago (N.D. Ill., 2002), 237 F.Supp.2d 895, 900. In such a situation, the analysis is based on the prima facie test outlined in McDonnell Douglas Corp. v.Green (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. Thus:
 {¶ 122} "To set forth a prima facie case of discrimination based upon a failure to promote, a plaintiff must show: (1) that he is a member of a protected class; (2) that he applied and was qualified for a promotion; (3) that he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. * * * The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination on the basis of race. In such cases, to satisfy the first prong of the prima facie case, the plaintiff must `demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority."' * * * To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." Sutherland v. Michigan Dept. of Treasury (C.A. 6, 2003), *Page 37 
344 F.3d 37 603, 614 (citations omitted).[4]
 {¶ 123} Courts applying the modified version have noted that it is not to be applied in a constricting fashion. The test does not preclude plaintiffs with direct evidence from bringing claims. Furthermore, "if a plaintiff cannot show background circumstances, but `has established a logical reason to believe that the [employer's] decision rests on a legally forbidden ground,' such as his race or gender, he may shift the burden to the defendant to prove that the challenged employment action was actually based on legitimate, non-discriminatory reasons."Mills, 171 F.3d 450, 457 (citation omitted).
 {¶ 124} "Once a plaintiff has established a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action at issue. * * * If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext.* * * When the burden shifts back to the plaintiff, although he must come forward with evidence that the defendant's reason for the employment action is false, he need not present independent evidence that the proffered reason is pretext for racial discrimination. * * *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148,120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (`[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to *Page 38 
conclude that the employer unlawfully discriminated.')."Sutherland, 344 F.3d at 614-15 (citations omitted).
 {¶ 125} In granting a directed verdict, the trial court found that Mitchell had not established sufficient background circumstances to show that Dayton was the unusual employer who discriminated against the majority. The trial court concluded that Mitchell had failed to establish the second prong of the prima facie test because on the only occasion on which Mitchell had applied, the job was offered to a white female, and Mitchell failed to apply thereafter. The trial court also found no evidence that Mitchell's further application for the job would have been futile. And finally, the trial court concluded that Mitchell did not comply with the fourth prong of the prima facie test, because he failed to show that he had similar qualifications to the candidate who had received the job.
 {¶ 126} The trial court went on to find that even if Mitchell established a prima facie showing, Lemmie had provided a non-discriminatory reason for the decision, in that she wanted to seek innovative people, and wanted to take the city in a new direction. The court also rejected pretext, by concluding that even if Mitchell's own testimony were accepted, Lemmie had specifically stated that Mitchell was not doing the things that Lemmie wanted (in terms of innovation).
 {¶ 127} We disagree with these findings, for several reasons. In light of the discussion above, we find sufficient evidence of "background circumstances" to support a prima facie case. Furthermore, the trial court overlooked the fact that the allegations were not simply ones of racial discrimination; gender discrimination was also alleged. Therefore, the fact that the job was "offered" to a white female does not negate discriminatory intent, nor does it preclude Mitchell from establishing a prima facie case. *Page 39 
 {¶ 128} The trial court also incorrectly ignored evidence that Mitchell's further application for the position would have been futile. Mitchell's own testimony, if believed, indicates that he was told by Seege (a city employee and Mitchell's supervisor) in December, 1999, that another national search was going to be conducted and that he (Mitchell) was not going to get the job. Under the circumstances, further application for the position would have been futile.
 {¶ 129} We also disagree regarding the lack of evidence that Mitchell's qualifications were similar to those of the individual ultimately selected (Peele). In this regard, the trial court did not discuss specific reasons for finding that the qualifications of these two individuals were not similar. We note that Davis, the Director of Public Works, sat on Peele's interview committee and was in a position to evaluate the relative merits of the candidates. Davis testified that Peele was not comparable to Mitchell. In finding otherwise, the trial court improperly discounted Davis's testimony. As we stressed earlier, the trial court's role in ruling on motions for directed verdict is to test legal sufficiency. The court is not allowed to judge the weight of the evidence or the credibility of witnesses. Schafer,138 Ohio App.3d at 257.
 {¶ 130} Several observations are in order regarding Lemmie's testimony about non-discriminatory reasons for the decision and the alleged lack of evidence of pretext. Lemmie did testify at trial about her reasons for refusing to promote Mitchell. However, the explanation offered at trial was never given to Davis, to Seege, or to Mitchell. While Lemmie may have felt that she was not obligated to explain her actions to anyone, the absence of an explanation at a time when it might logically have been expected is suspicious. In addition, some of Lemmie's testimony is inconsistent with other evidence. *Page 40 
For example, Lemmie testified that she wanted to hire an individual who met the vision and values of the organization the city was trying to develop, which was a "high performance organizational mode." However, this criterion was deleted from the rating sheets for candidates.
 {¶ 131} One of the few rating sheets that did survive was that of Tederryl James, the African-American who was part of the original competition with Mitchell, and who also applied for the job during the first national search. The trial court refused to admit and did not consider this evaluation form in granting the directed verdict. James's form is dated September 1, 1999, and lists various matters on which he was evaluated. Among the listed matters are items like "enthusiasm" and "general management experience." However, a number of items are crossed off the list. One of the deleted items is "high performance organization experience."
 {¶ 132} Lemmie testified that the selection criteria during all phases of Dayton's job search were essentially the same, meaning that high performance organization experience would not have been included for any candidates who were interviewed during the various selection processes. If experience with a high performance mode of doing business had been important, it is logical to assume that this qualification would not have been deleted from the evaluation sheet.
 {¶ 133} Another example of inconsistency relates to Lemmie's testimony that knowledge of the union was not essential for the job. Dayton's evidence, yet unheard, may cast a different light on affairs, but Lemmie's testimony currently comes across as an attempt to discount Mitchell's significant union experience, which no other candidate appears to have had. However, one of the specific categories on the ratings sheet is *Page 41 
"Management/Personal Style Compatibility with Union Interaction." Again, if this were an insignificant factor, one would expect it to have been omitted from the evaluation sheet.
 {¶ 134} Finally, through the testimony of Lemmie and Seege, Defendants attempted to show that Mitchell lacked experience with budgeting. Although this was belied by Mitchell's considerable budgeting experience as union president, "Budget Preparation/Control" is another category that was deleted from the evaluation sheet.
 {¶ 135} Based on the above discussion, we conclude that the trial court erred in finding that Mitchell failed to establish a primafacie case of discrimination. We stress that our conclusion is not a decision on the ultimate merits of the controversy — resolution of that issue is for the jury.
 {¶ 136} The trial court's final reason for granting a directed verdict is that there was no evidence on the issue of damages. Since this case is being remanded for trial, we will comment only briefly on the subject of damages. Employment discrimination awards are "designed to restore victims to the economic position that they would have enjoyed, but for the discrimination." Ohio Civ. Rights Comm. v. David Richard Ingram,D.C., Inc. (1994), 69 Ohio St.3d 89, 92, 630 N.E.2d 669. Further, "where the amount of back pay that would have been received by a victim of employment discrimination is unclear, any ambiguities should be resolved against the discriminating employer." 69 Ohio St.3d at 94.
 {¶ 137} The date of the alleged discrimination in the present case could be computed from the end of March, 1999, when the competition between Mitchell and James ended. Nearly two years elapsed from that time and the date that Mitchell retired on disability. During part of this time, Mitchell served as acting superintendent at a rate of pay that was 80% of what he would have earned as superintendent. Mitchell's salary as *Page 42 
acting superintendent was $50,000, which was substantially below the $63,356.80 offer to one candidate in June, 2000, and the $65,000 offer to another candidate in August, 2000. Mitchell also testified as to the difference in his disability pension based on the lower salary that he earned at the time of retirement. Since this evidence reveals an economic position to which Mitchell could be restored, the trial court erred in concluding that Mitchell did not present evidence of damages. Again, we express no opinion on the ultimate outcome of the case or the damages that might be recovered. We are simply indicating that the trial court should not have granted a directed verdict.
 {¶ 138} Mitchell raises several additional errors under the second and third assignments of error: the trial court's failure to admit evidence on the Plan; the exhibits and evidence about NFBPA; records of NFBPA dues paid by the City; historical practices in the waste collection department; and comparisons between the performance of Mitchell and that of the chosen candidate, Peele. Because we have already decided to remand the case for retrial, a lengthy discussion of excluded evidence is unnecessary. However, some mention is warranted, for the purpose of avoiding error on remand.
 {¶ 139} Evid. R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 402 further provides that all relevant evidence is generally admissible. Based on our previous discussion, evidence pertaining to Dayton's affirmative action plan, and to NFBPA, including NFBPA dues paid by the City, would be relevant.
 {¶ 140} Evidence regarding historical preference for an African-American as head of waste superintendent should have been admitted as well. An "`employer's past *Page 43 
discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination; this evidence should normally be freely admitted at trial.'" Anderson v. Genuine Parts Co., Inc. (C.A.8, 1997), 128 F.3d 1267, 1272. In this regard, courts have stressed that:
 {¶ 141} "`The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives. . . . Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices-evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.'"Hawkins v. Hennepin Technical Center (C.A. 8, 1990), 900 F.2d 153, 155 (citation omitted).
 {¶ 142} Our decision that such evidence is relevant is not a finding that we find the evidence dispositive of the ultimate issues. Those findings are for the jury.
 {¶ 143} As a final matter, we conclude that evidence about Peele's poor performance after being hired is irrelevant. Mitchell attempted to introduce evidence at trial about the fact that Peele was disciplined in Dayton for the same type of overtime violations that had occurred in Peele's previous employment. However, the information Dayton had when Peele was hired is the relevant consideration, not Peele's performance after she received the job. Mitchell's second and third assignments of error are sustained.
 IV *Page 44 {¶ 144} Mitchell's First, Second, and Third assignments of error having been sustained, the judgment rendered in favor of Dayton and Lemmie is Reversed, and this cause is Remanded for a new trial.
WOLFF, P.J., concurs.
[1] The entry denying the request was erroneously filed in the case that Mitchell had voluntarily dismissed. See Mitchell v. Lemmie, Montgomery C.P. Case No. 2001 CV 06769, June 15, 2005 Decision, Order and Entry Denying Plaintiff's Motion for Leave to Serve Interrogatories in Excess of the Amount Limited.
[2] The reason for the duplicate entry may have been that the prior entries had been incorrectly filed in the case that Mitchell voluntarily dismissed in 2004. However, the record does not indicate that this is why the duplicate entry was filed. Compare Mitchell v. Lemmie, Montgomery C.P. Case No. 2001 CV 06769, orders of August 26, 2005, and September 6, 2005, with Doc. No. 118, filed on January 20, 2006, in the present case.
[3] A different standard, of strict scrutiny, applies in the equal protection context. "To survive strict scrutiny, the state's race-based program must be justified by a compelling governmental interest, and the means chosen by the state to effectuate its purposes must be sufficiently narrowly tailored." Ritchey Produce Co., Inc. v. Ohio Dept.of Adm. Serv., 85 Ohio St.3d 194, 252, 1999-Ohio-262, 707 N.E.2d 871. Because Mitchell did not claim in the trial court that Dayton's Plan violated equal protection, our analysis is limited to standards applied under Title VII.
[4] Considerable disagreement exists among the federal circuits with regard to whether the modified version of the prima facie test should be used in reverse discrimination cases. Even panels of the Sixth Circuit have disagreed on the correct approach, since the modified version is seen as imposing an additional burden that may be suspect. See discussion in Mills v. Health Care Service Corp. (C.A. 7, 1999),171 F.3d 450, 455-57. For purposes of the present case, we will apply the modified version, since the Sixth Circuit does continue to use it.