[Cite as *Jones v. Unican Ohio, L.L.C.*, 2022-Ohio-948.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

LYNN JONES,                                    :

    Plaintiff-Appellant,             :

                                  No. 110564

    v.                                       :

UNICAN OHIO, LLC,                       :

    Defendant-Appellee.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 24, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-894267

---

*Appearances:*

McCarthy, Lebit, Crystal & Liffman Co., L.P.A., David M. Cuppage, Ann-Marie Ahern, and Frank T. George, *for appellant.*

Duane Morris LLP, Drew T. Dorner, and J. Colin Knisely, *for appellee.*

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant Lynn Jones ("Jones") challenges the directed verdict granted by the Cuyahoga County Court of Common Pleas on his claims for age discrimination, breach of contract, and promissory estoppel against appellee Unican

Ohio, LLC ("Unican"). After a thorough review of the law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 2} Jones worked in the container business since the 1970s and had developed a large network of professional contacts in the industry. One of those contacts was Paul Hoogenboom ("Hoogenboom"), a former vice president at RPM International, Inc. ("RPM").

{¶ 3} During the early part of 2012, Hoogenboom approached Jones to ask whether Jones could find a company that would be willing to open a can manufacturing plant in America to meet RPM's can/container needs. There were very few can/container manufacturers in the country at this time, which had resulted in can prices being inflated.

{¶ 4} Jones contacted Envases Universales ("Envases"), an international can supplier, about the prospect of entering the U.S. market. Envases expressed interest, and Jones introduced RPM to Envases. The two companies reached a tentative agreement in which Envases would open a can/container plant in the U.S., and RPM would give the new plant its can/container business.

{¶ 5} At the time of the introduction and subsequent negotiations, Jones was not employed by RPM or Envases. He assumed that if he presented a mutually beneficial opportunity to the two companies, he would be compensated for his efforts in some manner. Isaias Zapata ("Zapata") — a shareholder of Envases and a member of its board of directors — later asked Jones to work for him. In August

2012, at the age of 70, Jones entered into a contract (hereinafter the "Employment Agreement" or the "Agreement") with Envases, where Jones was to serve as "Vice President of Sales and Corporate Development — USA." Envases agreed to pay Jones a base salary of $180,000 and an annual bonus of "[o]ne-half of one percent (0.5%) of the total sales volume (seventy percent (70%) based on sales and thirty percent (30%) based on [EBITDA[1]])." Jones was to be employed for an initial term ending on August 1, 2017, but Envases had the "right to extend [the] Agreement for an additional term of two (2) years on terms mutually acceptable to the parties."

{¶ 6} Under the terms of the Agreement, Envases had the right to terminate Jones "at any time, with or without cause," and Jones could terminate the Agreement "at any time, for any reason." The Agreement further provided that it would "be assumed by any successor to [Envases] either in connection with a sale of its business, merger, consolidation or otherwise." In the event of Jones's termination, Section 5(c) states that "regardless of the reason for the termination, the Company shall pay Jones seventy-five percent (75%) of the base compensation remaining on the initial five (5) year term. Otherwise, the agreement shall continue for the initial term and the renewal term, if any."

{¶ 7} As part of his employment with Envases, Jones agreed to develop a can/container plant in the U.S. and to finalize the purchase agreement he had helped to negotiate between RPM and Envases. In February 2013, Envases formed a wholly

---

[1] EBITDA is a shorthand for earnings before interest, taxes, depreciation, and amortization.

owned subsidiary — Unican Ohio, LLC ("Unican") — in order to manufacture and sell its cans in the U.S. Jones maintains that he became a Unican employee and began serving as its Vice President of Sales.

{¶ 8} Jones helped find a location for Unican's manufacturing facility and negotiated a lease for the facility. He opened several sales accounts for Unican and finalized a purchase agreement between Unican and RPM, which he executed on behalf of Unican in his capacity as Vice President of Sales.

{¶ 9} Although Jones continued to report to Zapata, he testified that Unican held him out as being the "face of Unican." Unican paid Jones pursuant to the terms of the Agreement, and Jones was even given a raise in January 2016.

{¶ 10} On March 1, 2017, Zapata wrote to Jones, stating that he had "talked to Laura [Zapata, the CEO of Envases] yesterday and she gave me the green light to pay you a retirement bonus equivalent to 0.5% of the sales done from March 1, 2017 until your retirement regardless of EBITDA level." Zapata further asked, "What date would you like to set for your retirement?"

{¶ 11} Jones was troubled by the suggestion of his retirement. He replied to Zapata with the following proposal:

1. I would like to work for the next two years (end of 2018).

2. I would be paid a bonus instead of our original agreement, at the rate of ½% on all sales.

If I feel I have not achieved the goals I set for myself and Unican at the end of this time I hope you would let me continue in some capacity until I either fall over or feel I no longer can contribute.

**{¶ 12}** Zapata replied the same day to Jones's email, stating, "Sounds good to me [Jones], thanks for your email. Count on it." Jones believed that this email exchange ("March 2017 Emails") demonstrated the company's exercise of the renewal provision in the initial five-year contract.

**{¶ 13}** Jones testified that he relied on Zapata's promise of bonus compensation and continued employment. He made "various financial decisions" based on this email exchange. For example, he decided not to sell his boat or his vacation home in South Carolina.

**{¶ 14}** On September 11, 2017, Zapata emailed Jones to set a meeting to "talk about [his] retirement." Jones initially assumed that Zapata wanted Jones to remain employed even longer — that he wanted to discuss pushing Jones's retirement date beyond the end of 2018. Jones met with Zapata several weeks later. He testified as follows regarding the conversation at the meeting:

> [Zapata] said [Jones], I want to talk about your retirement. He said, we've got to set a date here. He said, you're looking tired. You're looking older. He said, you got to quit. You got to stop. He said, I want to set a retirement date of October 30th, I think he said, and I said, what? He said, yeah. He said, you know, why go on? He said, you know, we'll give you a little bit of money for your retirement, and that'll be it. You can go and live your life. Go play golf.
>
> I said, [Zapata], I'm not ready to retire. We have an agreement. He said, well — he said, you know, at your age, why are you going to do this? And he just wouldn't — I ran out of reasons why, and I said, I got to think about this. I was in shock, very frankly. I didn't see this coming.

Jones reiterated that he had no intention to retire.

{¶ 15} Regardless, the following day, Zapata announced to other Unican employees that "[Jones] is going to be retiring." Again, Jones objected to Zapata's comments, insisting that he was "not retiring."

{¶ 16} Jones testified that several days later, the following exchange occurred with Zapata:

> I called him a few days later in early October — 7th, 8th, something like that — and I told him, I said, [Zapata], I said, there's too much for me to do . . . . I said, I can't retire right now. I said, we got to complete the agreement, and so forth. He said, [Jones], why do you want to continue at your age? He said, stop. He said, I already talked to the Board. They've been advised. He said, I can't take it back. He said, the 30th is the date.

{¶ 17} Around this same time, Jones had a conversation with Eddie Crawford, a long-time friend who was also in the container business. Jones relayed to Crawford that he was being pushed out of Unican. Crawford inquired as to whether the company would be interested in selling Unican. Jones stated that he did not think so but that he would ask.

{¶ 18} That night Jones called Zapata and relayed the conversation. Zapata initially said no and that they "don't sell companies." Jones testified that Zapata subsequently asked Jones to send him the information about the company that was inquiring.

{¶ 19} Jones sent him an email with a link to the company's website. Zapata responded via email the next day with the following:

> [Jones], Unican is not for sale.

Having said that, I talked to Carlos and Tom yesterday, and I also do not appreciate your lack of support for the transition and your retirement schedule.

Far from benefiting from more time with you, I fear that * * * Unican is suffering.

This whole [sale] issue just aids uncertainty and gossip in the marketplace.

Based upon the above, I have decided to shorten your remaining time at Unican, setting a new retirement date at end of this month.

The decision is final.

{¶ 20} Jones was 75 years old at the date of the retirement. He testified that Tom Palmieri, who was Unican's sales manager and approximately 40 years younger than Jones, assumed his sales accounts at Unican.

{¶ 21} Jones filed suit against Unican, asserting claims for age discrimination, breach of contract, and promissory estoppel. Following discovery, Jones moved for summary judgment on his breach-of-contract claim. Unican, in turn, moved for summary judgment on all of Jones's claims. Both motions were denied.

{¶ 22} The case proceeded to a jury trial. At the conclusion of Jones's case-in-chief, Unican moved for a directed verdict on all counts. The trial court granted the directed verdict, stating as follows:

The Court finds that the Plaintiff was a member of a protected class, or at least has presented sufficient evidence to demonstrate that. I think he was only 75 at the time of his termination.

And the other element that's significant here for age discrimination is whether he was replaced by someone younger, and so according to Goodyear versus Waco Holdings, an Eighth District case, cites Cassel,

C-a-s-s-e-l, versus Schuster Electronics, Summit County Court of Appeals Case, 159 Ohio Appellate 3rd, 224.

"A person is replaced only when another employee is hired or reassigned to perform his duties.  An employee is not considered replaced 'when another employee is assigned to perform the plaintiff's duties in addition to other duties or when the work is redistributed among other existing employees already performing in related work.'"

Plaintiff argues that Mr. Palmieri assumed — a much younger person assumed the duties of Mr. Jones.  They did not call Mr. Palmieri, and I do not believe there was any evidence showing that all of his duties were assumed by Mr. Palmieri; and therefore, I find that the Plaintiff failed to meet their burden on the age discrimination case, and I am going to grant the directed verdict on age discrimination.

On what I think are the more complicated, confusing issues as to whether contract existed and whether the promissory estoppel contract involves an offer, an acceptance, and consideration, and Plaintiff's argue — presented evidence in the forms of Exhibits 6 and 7, that there was a new contract formed with Isaias Zapata Moran, and e-mails back and forth with Isaias Zapata.  Exhibit 7 — Trial Exhibit 7 shows an e-mail address for Mr. Zapata as:  Izm@euniversales.com.  That's E-u-n-i-v-e-r-s-a-l-e-s.

The negotiation for this alleged contract was with Mr. Zapata, and evidence failed to show that Mr. Zapata was an officer of Unican.

Well, nothing is very clear here regarding the extension of this contract, but the Court finds that the contract, if any, would have been with Envases Universales.

Plaintiff's Exhibit 1 clearly states that this — first paragraph:  This agreement is entered into on the 1st day of August 2012 between Lynn Jones of Chardon, Ohio, hereinafter referred to as, quote, Jones, and Industrias, I-n-d-u-s-t-r-i-a-s, Isame, I-s-a-m-e — I'll skip the list — a division of Envases Universales De Mexico, skip some language, hereinafter collectively referred to as the Company.

It's clear the agreement was originally entered into with Envases.  There's no evidence to show that Unican — and the Plaintiff's not arguing that Unican wasn't in existence at the time.

Now the Plaintiff is attempting to point to the successor liability clause in this original contract, which is, again, Plaintiff's Trial Exhibit Number 1, Section 8, entitled: Successor Liability, and it's understood that this agreement shall be assumed by any successor to the Company, either in connection with the sale of the business, merger, consolidation, or otherwise.

Otherwise is quite an ambiguous term, and Plaintiff would like us to believe that "otherwise" provides for the hatching of a new business from this parent company, but what must be remembered here is this contract — and I'm referring again to Plaintiff's Exhibit Number 1 — was a five-year contract that ended on July 31, 2017.

Exhibit 6 is dated — an e-mail dated from Lynn Jones, March 14, 2017, which was prior to the expiration of the contract, and the response — well, it's just easier to read the e-mail.

The Plaintiff would like the Court to consider that Exhibit 6 was an offer, and Exhibit 7 was an acceptance to satisfy two of the three elements for a contract. Now, the offer is, quote, Good evening, having lots of snow here. I'm worried Carlos won't believe me as I keep telling him it's just like Mexico City in the winter; however, I am tardy in sending this e-mail, and I apologize. It's a subject I find very difficult to discuss. To memorialize our conversation — and again, I guess there was some oral conversation at some point — quote, one, I would like to work for the next two years, paren, end of 2018, closed paren. Two, I would be paid a bonus instead of our original agreement, comma, at the rate of one half percent on all sales. If I feel I have not achieved the goals I set for myself and Unican at the end of this time, I hope you would let me continue in some capacity until I either fall over or feel I no longer can contribute. Your friend, [Jones].

The response is: Sounds good to me, [Jones]. Thanks for the e-mail. Count on it.

The response is from Isaias Zapata, again, with an e-mail from EUniversales.

The original contract put it on, quote, the Company, which again, is Envases Universales, to extend the agreement.

Section 5, Part B, the Company shall have the right to extend this agreement for an additional term of two years on terms mutually

acceptable to the parties. The Court finds that the Company never extended this agreement. There was no language showing that the Company reached out to extend the agreement. There was no evidence showing that the Company reached out to extend the agreement.

Mr. Jones, through his e-mail on Plaintiff's Exhibit 6, puts in, what the Court finds to be, an ambiguous offer forward, that Mr. Zapata said, quote, Sounds good to me. Count on it.

Number one, I do not find that there was sufficient evidence to put this matter to a jury that this is a clear meeting of the minds as to terms.

It is unclear reading this whether there would be a base salary. It could be perceived as he would just be paid a bonus instead of our original agreement.

The original agreement, which the Plaintiff would like to [sic] us to include as Exhibit 1, states there's a base salary, so one cannot conclude from this e-mail of Mr. Jones that the bonus is going to be his entire salary or in addition to his base salary.

Additionally, the evidence has shown that Mr. Jones never collected a bonus as outlined in Section 5 of the original contract.

So one, this e-mail, the Court finds is too ambiguous to constitute a clear offer and acceptance, and number two, the Court finds that this new contract — not an extension, but new contract, this is different from Exhibit 1 — was with a nonparty, Envases Universales; therefore, the Court is going to grant directed verdict in favor of the Defendant on this.

Then lastly, the promissory estoppel requires promise relied upon to a detriment. There was no evidence here presented showing that there was a detriment, you know, to the Plaintiff when he was let go.

He did not move anywhere. He did not take on any additional duties. The element of promissory estoppel has not been fully satisfied by the Plaintiff, and the Court also is going to grant directed verdict in favor of the Defendant.

**{¶ 23}** Jones then filed the instant appeal, assigning three errors for our review:

1.   The trial court committed reversible error by granting defendant/appellee's motion for a directed verdict on plaintiff/appellant's claim of age discrimination.

2.   The trial court committed reversible error by granting defendant/appellee's motion for a directed verdict on plaintiff/appellant's claim of breach of contract as modified and extended.

3.   The trial court committed reversible error by granting defendant/appellee's motion for a directed verdict on plaintiff/appellant's claim for promissory estoppel.

## II. Law and Analysis

**{¶ 24}** All three of Jones's assignments of error stem from the trial court's granting of a directed verdict on all of Jones's claims. A trial court should grant a motion for directed verdict when "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4); *Krofta v. Stallard*, 8th Dist. Cuyahoga No. 85369, 2005-Ohio-3720, ¶ 10.

**{¶ 25}** A motion for directed verdict does not test witness credibility or the weight of the evidence. *Krofta* at ¶ 10. The motion instead tests "the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact." *Id.* A trial court properly grants a motion for directed verdict where the party opposing the motion fails to adduce any evidence of at least one essential element of the claim. *Id.* at ¶ 11.

**{¶ 26}** "A jury should consider a plaintiff's claim only if the probative evidence, if believed, would permit reasonable minds to come to different conclusions as to the essential issue of the case." *Sanek v. Duracote Corp.*, 43 Ohio St.3d 169, 172, 539 N.E.2d 1114 (1989). *Kocijan v. S & N, Inc.*, 8th Dist. Cuyahoga No. 80414, 2002-Ohio-3775, ¶ 34. If substantial evidence exists in support of plaintiff's claim, the motion must be overruled. *Pariseau v. Wedge Prods., Inc.*, 36 Ohio St.3d 124, 127, 522 N.E.2d 511 (1988).

**{¶ 27}** We review de novo whether the trial court properly entered a directed verdict. *Krofta*, 8th Dist. Cuyahoga No. 85369, 2005-Ohio-3720, at ¶ 9.

## A. Age-Discrimination Claim

**{¶ 28}** In Jones's first assignment of error, he argues that the trial court erred in granting Unican's motion for a directed verdict on Jones's age-discrimination claim based upon Jones's failure to present evidence that he was replaced by a younger employee.

**{¶ 29}** Jones is correct that he was not required to prove that he was replaced by a younger employee to demonstrate age discrimination. A plaintiff may prove intentional age discrimination in employment (1) by direct evidence that a termination or other adverse employment decision was motivated by age; or (2) indirectly, by circumstantial evidence, using the burden-shifting method articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by the Supreme Court of Ohio in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), and *Plumbers &*

*Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981), and modified in *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781.

{¶ 30} Jones contends that he presented direct evidence of age discrimination. Specifically, Jones points to the remarks related to Jones's age made by Zapata, his direct supervisor, that he contends were unambiguously related to his discharge.

{¶ 31} Direct evidence is "that which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods.*, 176 F.3d 921, 926 (6th Cir.1999). In all cases, the plaintiff "must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination." *Byrnes v. LCI Communications Holdings Co.*, 77 Ohio St.3d 125, 130, 672 N.E.2d 145 (1996). Explicit statements of discriminatory intent constitute such direct evidence of discrimination. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 577, (6th Cir.2000); *Wittman v. Akron*, 9th Dist. Summit No. 21375, 2003-Ohio-5617, ¶ 16. Such statements are distinguished from harmless, stray remarks by the nexus between the improper motive and the decision-making process or personnel.

{¶ 32} Direct evidence is the type of evidence that, if true, requires no inferential leap in order for a court to find discrimination. *Glemaud v. MetroHealth Sys.*, 8th Dist. Cuyahoga No. 106148, 2018-Ohio-4024, ¶ 62, citing *Mitchell v. Lemmie*, 2d Dist. Montgomery No. 21511, 2007-Ohio-5757, ¶ 102, citing *Bass v. Bd.*

*of Cty. Commrs.*, 256 F.3d 1095 (11th Cir.2001). '"An employer's [statements] may constitute direct evidence that an employee who was the subject of an adverse employment action was a victim of discrimination.'" *Id.* at ¶ 75, quoting *Brown v. Tellermate Holdings, Ltd.*, S.D.Ohio No. 2:11-cv-1122, 2015 U.S. Dist. LEXIS 113962, 7 (Aug. 27, 2015).

{¶ 33} Courts consider four factors in determining whether an employer's comments demonstrate discrimination:

> "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination."

*Glemaud* at ¶ 75, quoting *Skelton v. Sara Lee Corp.*, 249 Fed.Appx. 450, 455 (6th Cir.2007), citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir.2002).

{¶ 34} None of these factors is individually dispositive of discrimination; they must be evaluated as a whole, considering all of the circumstances. *Peters* at 478, citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994).

{¶ 35} Jones argued that he provided direct evidence of age discrimination in the form of Zapata's statements and questions regarding Jones's retirement plans. As noted above, Zapata was a shareholder and member of the board of directors of Envases. While there was no evidence that he had any role in Unican, he was clearly the decision-maker with regard to Jones's employment.

**{¶ 36}** In considering all of the circumstances surrounding the statements at issue, we note the following: (1) at the time the Agreement was signed and Jones was hired by Zapata, Jones was 70 years old; (2) the Agreement provided for a five-year term of employment, which could be extended to seven years, meaning that Jones would potentially be working until age 75 or 77; (3) at the time of the March 2017 emails, where Zapata agreed to Jones continuing to work for at least two more years, Jones was 74 or 75 years old; and (4) in the March 2017 emails, Jones requested to work "until either I fall over or feel I can no longer contribute," to which Zapata did not object in his response.

**{¶ 37}** Zapata was aware of Jones's age both at the time he was hired and four years later at the time of the claimed renewal of the Agreement. Jones appears to argue that his age suddenly became an issue for Zapata, a mere six months later when Zapata began pushing for a date for Jones's retirement and suggested that Jones looked "tired" and "older." At this time, Jones was hardly much older than he was at the time of the March 2017 Emails, when Zapata agreed that Jones would continue to work for two additional years and potentially beyond — until Jones "[fell] over or [felt he could] no longer contribute." For this court to determine that Zapata's advancement of Jones's retirement date constituted age discrimination requires an inference that age was a factor in Zapata's decision despite not playing a role in Jones's hiring at age 70 or Zapata's agreement for Jones to work until he was age 77 or older. Such an inferential leap cannot be made in the context of claimed direct evidence.

**{¶ 38}** Because of the inferential leap required, we therefore find that Jones has presented *indirect* evidence of discrimination but has not presented *direct* evidence. "Indirect evidence 'is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.'" *Glemaud*, 8th Dist. Cuyahoga No. 106148, 2018-Ohio-4024, at ¶ 55, quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003), citing *Kline v. TVA*, 128 F.3d 337, 348 (6th Cir.1997).

**{¶ 39}** Absent direct evidence of age discrimination, a claimant seeking to establish a prima facie case via indirect evidence must show that he or she (1) is a member of a protected class; (2) was subject to an adverse employment decision; (3) is qualified for the position, and (4) was replaced by a substantially younger person or that a similarly situated nonprotected employee was treated more favorably. *Leeds v. Weltman, Weinberg & Reis Co., L.P.A.*, 8th Dist. Cuyahoga No. 110348, 2021-Ohio-4123, ¶ 36, citing *Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 582, 664 N.E.2d 1272 (1996).

**{¶ 40}** In his brief, appellant argues that he has presented indirect evidence of age discrimination and that his termination constituted a reduction-in-force ("RIF"). "When a plaintiff's position is eliminated in a RIF, the fourth element of the prima facie case is modified to require the plaintiff to provide additional evidence, whether direct, circumstantial, or statistical, to establish that age was a factor in the decision to terminate." *Leeds* at ¶ 37, citing *Vickers v. Wren Industries*, 2d Dist. Montgomery No. 20914, 2005-Ohio-3656, ¶ 29, citing *Mack v. B.F.*

*Goodrich Co.*, 121 Ohio App.3d 99, 101-102, 699 N.E.2d 97 (8th Dist.1997); *Kundtz v. AT&T Solutions, Inc.*, 10th Dist. Franklin No. 05AP-1045, 2007-Ohio-1462, ¶ 21.

**{¶ 41}** While Jones argues that this should be analyzed as a RIF case, there was no evidence presented that a RIF occurred at Unican. The Sixth Circuit has explained that "'[a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.'" *Schram v. Schwan's Sales Ents.*, 124 Fed.Appx. 380, 384 (6th Cir.2005), quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990).

**{¶ 42}** Because there was no evidence presented that Unican eliminated Jones's position based upon business considerations, we cannot analyze Jones's claim as one arising from a RIF. Accordingly, in order to establish indirect evidence of age discrimination, Jones had to have demonstrated that he was replaced by a substantially younger person. While Jones argued at trial that he was replaced by Tom Palmieri, who was substantially younger than him, he appears to have abandoned that argument on appeal.

**{¶ 43}** We therefore find that because Jones failed to present any evidence that this was a RIF case or that he was replaced by a substantially younger employee, Jones did not make a prima facie case of discrimination via indirect evidence.

**{¶ 44}** Thus, while the trial court should have addressed both direct and indirect evidence when it ruled upon Unican's motion for directed verdict, we find that the directed verdict on Jones's age-discrimination claim was proper. Jones did not present direct evidence of discrimination, nor did he present a prima facie case

based upon indirect evidence because he failed to present evidence that a RIF occurred or that he was replaced by a substantially younger employee. Jones's first assignment of error is overruled.

## B. Breach-of-Contract Claim

**{¶ 45}** In Jones's second assignment of error, he argues that the trial court erred in granting a directed verdict on his breach-of-contract claim.

**{¶ 46}** "In order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed; '[(2)] the nonbreaching party performed its contractual obligations; [(3)] the other party failed to fulfill its contractual obligations without legal excuse; and [(4)] the nonbreaching party suffered damages as a result of the breach.'" *Prime Properties, Ltd. Partnership v. Badah Ents.*, 8th Dist. Cuyahoga No. 99827, 2014-Ohio-206, ¶ 13, quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996), citing *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (8th Dist.1995).

**{¶ 47}** Jones contends that Unican is liable for breach of contract on one of two theories: (1) Unican assumed the Agreement with Jones and became bound by the terms as modified via the March 2017 Emails; or (2) even if Unican did not assume the Employment Agreement, Unican and Jones entered into a separate express contract based upon the March 2017 Emails.

**{¶ 48}** The contract states that it was between Jones and "Industries Isame, S.A.P.I. de C.V., a corporation organized under the laws of the Mexican United

States ('Isame') and a division of Envases Universales de Mexico, S.A.P.I. de C.V. ('EUM'), hereinafter collectively referred to as the 'Company.'"

{¶ 49} There is no dispute that the original Agreement had run its five-year course. Only Envases had the right to extend the Agreement for an additional term of two years "on terms mutually acceptable to the parties." Thus, the question becomes whether the Agreement was renewed by Envases through the March 2017 Emails. If the email exchange was not a renewal, we must also consider whether it was a separate, additional contract.

{¶ 50} Unican argues that it cannot be held liable on the Agreement because it was not a party to it. Jones argues that the Agreement was impliedly assigned to Unican. However, section 10 of the Agreement specifically states, "This Agreement shall not be assigned by either party without the prior written consent of the other party * * * ." There was no evidence presented of any written assignment of the Agreement. Because the Agreement precludes implied assignment, we cannot find that one occurred. Accordingly, the Agreement and any renewal thereof were between Jones and Envases, not Jones and Unican. Unican was not a party and did not assume the Agreement; consequently, Unican cannot be held liable on the Agreement or any renewal thereof.

{¶ 51} We must next consider whether the March 2017 Emails between Zapata and Jones constituted a new, separate agreement and, importantly, whether there was a meeting of the minds between the two. As noted above, Zapata is an Envases shareholder and member of its board of directors. While he was Jones's

direct supervisor, there was no evidence presented that Zapata had any role in Unican. However, even assuming arguendo that Zapata was acting on behalf of Unican, we still cannot find that there was a valid contract between Jones and Unican.

{¶ 52} To be enforceable, a contract must have "'an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, 118 N.E.3d 439, ¶ 17-18 (8th Dist.), quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16. There must also be a meeting of the minds as to the essential terms of the contract. *Id.*

{¶ 53} In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange. *Tiffe v. Groenenstein*, 8th Dist. Cuyahoga No. 80668, 2003-Ohio-1335, ¶ 25, citing 1 Restatement of the Law 2d, Contracts, Section 17, at 52 (1981). "In other words, when entering into a contract, the parties must have a distinct and common intention which is communicated by each party to the other." *Miller v. Lindsay-Green, Inc.*, 10th Dist. Franklin No. 04AP-848, 2005-Ohio-6366, ¶ 63, citing *Huffman v. Kazak Bros., Inc.*, 11th Dist. Lake No. 2000-L-152, 2002-Ohio-1683. As part of a meeting of the minds, "there must be a definite offer on one side and an acceptance on the other." *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995).

**{¶ 54}** "'Terms of a contract are adequate if they provide a foundation for determining whether a breach occurred and for establishing an appropriate remedy.'" *Heath Wallace, D.D.S., LLC v. Kalniz, Choksey Dental — Ralston, Inc.*, 6th Dist. Wood No. WD-12-048, 2013-Ohio-2944, ¶ 21, quoting *Huntington Natl. Bank v. R.R. Wellington, Inc.*, 2012-Ohio-5935, 983 N.E.2d 941, ¶ 25 (11th Dist.). The essential terms of the agreement must be "'reasonably certain and clear'" and mutually understood by the parties. *Kostelnik* at ¶ 16-17, quoting *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376, 683 N.E.2d 337 (1997). As the Supreme Court of Ohio stated in *Rulli*:

> "A court cannot enforce a contract unless it can determine what it is. * * * [The parties] must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are."

*Rulli* at *id.*, quoting 1 Corbin on Contracts, Section 4.1, at 525 (Rev.Ed.1993).

**{¶ 55}** In analyzing the March 2017 Emails, the preliminary email from Jones (the claimed offer) only pertained to two terms: his bonus structure and how long he would like to continue working. If, as Jones claims, this is a new separate agreement between himself and Unican, there are many terms missing. The March 2017 Emails are insufficient for the court to determine what the terms of the actual agreement are. Consequently, Jones has failed to demonstrate the existence of a valid contract between himself and Unican, the first element of a claim for breach of contract. Because reasonable minds could therefore not reach different conclusions

as to whether a contract even existed, the trial court did not err in granting a directed verdict on this claim.

**{¶ 56}** Jones's second assignment of error is overruled.

### C. Promissory Estoppel

**{¶ 57}** In Jones's third assignment of error, he argues that the trial court erred by granting a directed verdict on his promissory-estoppel claim.

**{¶ 58}** "The doctrine of promissory estoppel is equitable in origin and nature and arose to provide a remedy through the enforcement of a gratuitous promise." *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 24. "Promissory estoppel has been defined by the Restatement of Contracts, 2d as '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Id.* at ¶ 23, citing 1 Restatement of the Law 2d, Contracts, Section 90, at 242 (1981).

**{¶ 59}** Jones claims that he relied upon Zapata's promise in the email renewing his Agreement for two additional years. He testified that he was injured by his reliance on the promise in the form of "various financial decisions" that he made and the fact that he chose to keep his vacation home and his boat and continued to work at Unican.

**{¶ 60}** Again, Zapata, a member and shareholder of Envases, made the alleged promise. There was no evidence adduced showing that any employee or

representative made any alleged promise on behalf of Unican. Moreover, there was no evidence presented to show the actual amount of Jones's claimed damages. Thus, Jones failed to make a prima facie case of promissory estoppel, and the trial court did not err in granting a directed verdict on this claim.

{¶ 61} Jones's third assignment of error is overruled.

### III. Conclusion

{¶ 62} The trial court did not err in granting a directed verdict on all of Jones's claims. Jones failed to demonstrate that an employee or representative of Unican made discriminatory statements or promises to extend his employment. Further, the March 2017 Emails did not constitute a contract between Unican and Jones. All of appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
LISA B. FORBES, J., CONCUR