[Cite as *Tseng v. MetroHealth Sys.*, 2025-Ohio-1657.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

LEE H. TSENG, M.D.,                    :

    Plaintiff-Appellant,          :

                                       No. 114057

    v.                            :

THE METROHEALTH SYSTEM,                :

    Defendant-Appellee.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 8, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-960594

---

### *Appearances:*

Employment Law Partners, LLC, and Kami D. Brauer; The
Moskowitz Firm and Joshua B. Fuchs, *for appellant*.

Gordon Rees Scully Mansukhani, David A. Campbell, and
Y. Timothy Chai, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} In this appeal, plaintiff-appellant, Dr. Lee H. Tseng, M.D. ("Dr. Tseng"), argues that the employee wage compensation plan adopted by defendant-appellee, The MetroHealth System ("MHS"), is discriminatory and violates

R.C. 4111.17 (Ohio's Equal Pay Act) and 4112.02 (age discrimination). MHS maintains that there is no evidence of age discrimination against Dr. Tseng and its compensation plan does not violate Ohio's Equal Pay Act. At trial, MHS's motion for directed verdict was granted at the close of Dr. Tseng's case-in-chief. We are now asked to determine whether the trial court erred in granting MHS's directed verdict motion. For the reasons set forth below, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 2} Dr. Tseng began his career as a doctor at MHS when he started his residency there in 1992 and has been employed at MHS as a radiologist for more than 25 years. In 2018, MHS implemented a new physician compensation plan. Under this compensation plan, Dr. Tseng's income includes both a base salary and incentive compensation.[1] The base salary for each physician is based on two factors: (1) the physician's specialty, and (2) the physician's academic rank. The academic rank is driven by the fact that MHS is a teaching hospital affiliated with Case Western Reserve University Medical School ("CWRU"). Dr. Tseng's specialty is vascular interventional radiology, and his academic rank is assistant professor.

{¶ 3} In 2021, MHS completed an assessment that resulted in the two younger radiologists in Dr. Tseng's department receiving 12 percent raises and Dr. Tseng receiving a 6 percent raise. Following these raises, Dr. Tseng brought his concerns of age discrimination to his superiors. According to Dr. Tseng, MHS failed

---

[1] The incentive portion of the compensation plan is not at issue.

to engage in any investigation or analysis of its compensation plan to determine whether the plan was discriminatory.

{¶ 4} In March 2022, Dr. Tseng filed a complaint against MHS alleging two causes of action — violation of R.C. 4111.17 (Ohio's Equal Pay Act) and violation of R.C. 4112.02(A) (age discrimination). Specifically, Dr. Tseng alleges that within his department there were two other vascular interventional radiologists who were substantially younger, less experienced, and had less seniority than him. According to Dr. Tseng, MHS issued the two younger physicians 12 percent raises but issued him a 6 percent raise, ultimately reducing his base salary rate so that Dr. Tseng and the younger physicians would receive the same base salary rate. Dr. Tseng contends that MHS reduced his base salary by adopting a discriminatory compensation system that negatively impacted older physicians, because this system disregarded his credentials and years of experience, service, seniority, and longevity. Although Dr. Tseng complained to his superiors, he alleges that MHS has continued to pay him under its discriminatory compensation plan. Thus, Dr. Tseng alleges that MHS has and continues to violate R.C. 4111.17 by paying him at a lesser rate, on the basis of his age, than similarly situated younger physicians whose positions require equal skill, effort, and responsibility under similar working conditions.

{¶ 5} With regard to his age-discrimination claim, Dr. Tseng alleges MHS violated R.C. 4112.02(A) under two theories — disparate impact and disparate treatment. Under Dr. Tseng's theory of disparate impact, he alleges that MHS's compensation plan has a disparate impact, or falls more harshly, on physicians over

the age of 40. Under Dr. Tseng's theory of disparate treatment, he alleges that MHS discriminated against him on the basis of his age when MHS reduced his base salary rate by giving him a lower wage increase than other physicians who were substantially younger, less experienced, and had less seniority than Dr. Tseng.

**{¶ 6}** In response, MHS filed an answer denying that it violated R.C. 4111.17 or 4112.02(A) and alleged several affirmative defenses, including that "[Dr. Tseng's] claims fail because [Dr. Tseng's] age, or any other protected category, played no role in [Dr. Tseng's] compensation"; "[MHS's] physician compensation system is lawful because employees are paid the same for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions"; and "[t]he differences in percentage increase levels were due to [MHS's] application of its neutral, non-discriminatory physician compensation program." (MHS's answer, May 10, 2022.) The matter proceeded to a jury trial in May 2024, at which the following evidence was adduced.

**{¶ 7}** Dr. Tseng, who was 57 years old at the time of trial, testified that he has been with MHS for 31 years in total. He first started out as a resident in 1992, which was a five-year program. Next, he completed a one-year fellowship at MHS in a radiology subspecialty known as vascular interventional radiology. On May 19, 1999, Dr. Tseng accepted a position as a radiologist with MHS. Currently, Dr. Tseng is a vascular interventional radiologist with MHS, holds the academic rank of assistant professor with CWRU, and is board certified in diagnostic radiology and

interventional radiology.[2]  Dr. Tseng testified that CWRU determines the academic rank of the MHS physicians.  In March 2021, Dr. Tseng was .8 FTE or 80 percent full-time equivalent, which meant that he would "work four out of the five weekdays and [he] would be on-call at that time one of those four days . . .[,] which could be anywhere from five to 8:00 at night, we continue our call through to the morning hours, 8:00 [a.m.] when the shift comes in and you continue your work at that time so one day a week you do that. . . . And then if there were four of us so we rotated our weekend calls every fourth weekend[.]"  (Tr. 67-68.)

{¶ 8}   In March 2021, Dr. William Baughman, M.D. ("Dr. Baughman"), who was the interim chair of MHS's Radiology Department, gave Dr. Tseng a letter during a meeting at which Dr. Baughman told him that all the interventional radiologists were getting a 12 percent raise.  The letter he received indicated that his new annual base compensation was $353,689.  According to Dr. Tseng, this was actually a 6 percent pay increase, not 12 percent as Dr. Baughman indicated.  Consequently, Dr. Tseng asked to meet with Dr. Baughman to discuss the discrepancy.  Dr. Baughman told him "there's nothing he can do."  (Tr. 71.)  Dr. Baughman further told Dr. Tseng that he could talk to his boss, Dr. Bernard Boulanger, M.D., the chief clinical officer at MHS, and see if the three of them could meet to address Dr. Tseng's concerns.

---

[2] The ranks above assistant professor are associate professor and professor.

{¶ 9} Around this time, Dr. Tseng realized that his two younger colleagues received a 12 percent raise and not the 6 percent raise he received. His two younger colleagues were at ages 45 and 44, respectively; had been with MHS for 8½ years and 4½ years respectively; and only of one them was board certified. Also in May 2021, Dr. Tseng testified that he increased to 1.0 FTE from .8 FTE, which meant that his schedule was "five days a week during the weekdays taking call one of those weekdays Monday through Thursday . . . and being on-call for the weekend[.]" (Tr. 73-74.)[3]

{¶ 10} Dr. Tseng complained again about the discrepancy in the raises at a subsequent meeting with Dr. Baughman. Dr. Tseng stated to Dr. Baughman, "[I]t seems that [MHS] holds people hostage who are close to retirement in PERS. And he nodded his head and agreed." (Tr. 75.) Then on April 22, 2021, Dr. Tseng called Dr. Boulanger's secretary to schedule a meeting with Dr. Boulanger about his raise. Dr. Tseng "was distraught with the discrepancy with the pay raise and [he] felt like [he] was being treated unfairly. So [he] wanted to talk. Dr. Baughman didn't give [him] any answers[.]" (Tr. 76.) In response, Dr. Boulanger's secretary instructed him to speak with Dr. Baughman about his raise, which made Dr. Tseng feel "like [he] was getting the runaround." (Tr. 77.) Dr. Tseng testified that he never met with Dr. Boulanger "personally about [his] pay . . . [a]nd that . . . hurt a lot." (Tr. 77.)

---

[3] Dr. Tseng testified that at 1.0 FTE, his pay increased to $442,104.

{¶ 11} On May 4, 2021, Dr. Tseng again expressed his concerns by emailing both Dr. Baughman and Dr. Boulanger. In his email, Dr. Tseng stated:

> I am writing to again express my objection to receiving a lesser raise than the younger physicians with whom I work. I believe this is discriminatory and based upon [his] age rather than upon my merits.
>
> For instance, [Dr. C.] was given twice as much of a raise although he is not board certified in our specialty and has approximately 15 years less experience.
>
> I have tried to address this with both of you previously without success but still feel that this compensation discrimination must be addressed.

(Tr. 77-78). According to Dr. Tseng, nobody at MHS agreed to discuss this issue with him at any time before the filing of his complaint. Dr. Tseng testified that he did not leave MHS because he was so close to fully vesting in his PERS; it "would be foolish to pick up and go elsewhere." (Tr. 84.)

{¶ 12} Dr. Tseng also testified that in 2022, three younger interventional radiologists were hired by MHS. These younger physicians, who were all in their 30s, were paid the same salary as Dr. Tseng, who had trained them.

{¶ 13} On cross-examination, Dr. Tseng testified that "this situation here has soured" his experience at MHS, but he has "always enjoyed working with [MHS.]" (Tr. 97.) He further testified that no MHS employee personally discriminated against him based on his age. (Tr. 102.) When asked by defense counsel how much more than other interventional radiologists is he entitled to, Dr. Tseng replied:

> Well, you know, I've worked at Metro since 1992. I put a lot of dedication and loyalty to Metro. I've worked through years where we were shorthanded and [Dr. K.], my partner at that time, had people leave. And to help out we decided to take call every other night to split the call and to work every day.

We didn't ask for anything. We just were good soldiers and worked through it. And then I felt that six percent represented my entire career. And to take it away from me without even the decency of an explanation and you know saying, hey, I'm sorry, but we're going with a new model, whatever, you know it represents my livelihood. My entire life was spent at Metro.

(Tr. 128-129.)

{¶ 14} Dr. Tseng was grandfathered under the compensation plan when it was adopted in 2018. At that time, his base salary was higher than the market. Due to the grandfather status, Dr. Tseng acknowledged that he was paid more than the other vascular interventional radiologists with the same academic rank in 2018, 2019, and 2020. Dr. Tseng continued to receive a higher salary until the market caught up to his higher salary in 2021, at which point he received the 6 percent raise and his colleagues received a 12 percent raise. Dr. Tseng further acknowledged that all the vascular interventional radiologists with the same academic rank and who were also over forty years old were paid the same base salary after the 2021 pay increase. Dr. Tseng admitted that he and the other vascular interventional radiologists were receiving equal pay for equal work. He testified:

[MHS COUNSEL]: Okay. And . . . just so we are clear, I should have asked you one final question on this, when we are looking at the interventional radiologist in 2021 and every year after, you testified every interventional radiologist with the same academic rank were paid the same base salary as you, correct?

[DR. TSENG]: Correct.

[MHS COUNSEL]: So equal pay, equal work, right?

[DR. TSENG]: I don't know that statement is true or not but, yes, according to this chart you're equal pay, equal work. Yeah.

(Tr. 134.)

{¶ 15} Dr. Baughman testified that he was the interim chair of MHS's Radiology Department from October 2020 – August 2021, when the full-time replacement was hired. He was 43 years old at that time and became an associate professor with CWRU in either 2018 or 2019. Dr. Baughman testified that he and Dr. Tseng are "workplace friend[s]" and Dr. Tseng was one of his mentors. (Tr. 188.)

{¶ 16} With regard to the 2018 compensation plan, Dr. Baughman testified that "part of the sell on the compensation plan is no one's going to get a pay cut. What that meant is people that were above those levels the new base compensation were going to keep their higher base compensation" until the "salaries would come up eventually they would equalize[,]" meaning that "they would raise together from that point forward." (Tr. 194-195.)

{¶ 17} Dr. Baughman testified that, in the wintertime of 2020, he brought up staffing issues to administration, suggesting that MHS does a "compensation review of [the interventional radiologists] to make sure [MHS was] competitive in the market so [MHS does not] lose any more physicians." (Tr. 190.) As a result of the review, Dr. Baughman met individually with Dr. Tseng in March 2021 to discuss his pay increase, which Dr. Baughman testified was not expected under the compensation plan. According to Dr. Baughman, prior to meeting with Dr. Tseng, MHS administration "told [him] it's a 12 percent increase. They didn't disclose to [him] that Dr. Tseng had a higher base salary which [he] was not aware of and so

basically they came and [said] here are their letters you should present to them. These are their new base salaries." (Tr. 191.)

{¶ 18} Dr Baughman was surprised when Dr. Tseng brought the pay raise discrepancy to his attention. Dr Baughman testified, "I was taken aback and I was sort of apologetic because I didn't . . . know that he had a higher base salary so I sort of oversold it to him as a 12 percent raise and I didn't realize. Like I said it was a sudden transition and I was not given a document when I became interim chair that had everyone's salaries on it. Even I as the interim chair didn't know how much everyone made." (Tr. 196.)

{¶ 19} According to Dr. Baughman, when they met to discuss the discrepancy, Dr. Baughman discussed Dr. Tseng's grandfather status and also told Dr. Tseng how he himself was impacted by the grandfather status. Dr. Baughman "went through the process to get promoted with [CWRU] . . . expecting a pay raise and then realized that . . . [he] was grandfathered in. [He] had a higher base salary . . . and [he] did not get one." (Tr. 198.) Additionally, at all times during this process, Dr. Baughman testified that he "was doing whatever [he] could to retain [Dr. Tseng]. Plus [Dr. Baughman thought] he's an excellent physician. He was a highly valuable asset to the hospital." (Tr. 202.)

{¶ 20} Kelly Andolek ("Andolek"), MHS's Executive Director of Provider Enterprise, was one of the individuals who drafted the compensation plan, which is still in effect today. Andolek testified that this plan is divided into multiple "tracks." MHS's radiologists, including Dr. Tseng, are paid under the plan's "Group" track.

Under the "Group" track, the base salary of each radiologist is determined by looking at the physician's specialty and academic rank. While the plan went into effect in 2018, all of MHS's radiologists at the time in the "Group" track, including Dr. Tseng, received their first scheduled raises in 2021.

{¶ 21} According to Andolek, Dr. Tseng received approximately a $25,000 raise under the new compensation plan and his two younger colleagues each received approximately a $47,000 raise. Andolek testified that the plan does not factor into anything but "specialty and academic rank" and when she drafted the plan, "years of service was never looked at" and age was not "take[n] into consideration[.]" (Tr. 160, 161, and 171.) At the time of the raises, Dr. Tseng and his colleagues were all vascular interventional radiologists and assistant professors. MHS's nondiscrimination policy provides that MHS does not tolerate discrimination based on several characteristics, including age. When asked about Dr. Boulanger's response to Dr. Tseng's age discrimination allegation, Andolek testified, "I guess I could see you would think it would be brushing him off." (Tr. 171.) Andolek further testified that MHS never did an analysis to determine whether the plan has an adverse impact on age because the plan "was based on academic rank and specialty so age was never even brought into it." (Tr. 173.)

{¶ 22} Dr. Tseng's expert witness, Dr. Shane Thompson, Ph.D. ("Dr. Thompson"), testified that he is an economist. Dr. Thompson explained that he performed a "multivariant regression analysis," which is "a statistical technique where you've got several factors that can especially explain a factor of interest and

you're able to isolate each one of those factors individually and control for other confounding factors that might explain what's going on." (Tr. 209.) Dr. Thompson performed the following two kinds of analyses: "whether there . . . was statistical evidence of discrimination by age in the compensation plan at [MHS] . . . [a]nd . . . if there w[as] determined to be age discrimination in the compensation plan what were the economic damages relating to Dr. Tseng." (Tr. 210.) In formulating his analysis, Dr. Thompson relied on MHS's salary chart identifying the annual earnings of MHS's radiologists and Dr. Tseng's earnings history and retirement benefits.

{¶ 23} Dr. Thompson testified that he ran an analysis to determine "if age played a part in the level of the raise that the [radiologists] received" while holding other variables constant, such as "academic rank" and "specific specialty." (Tr. 211-212.) Dr. Thompson testified that his analysis included all but 6 of the 34 doctors in the radiology department. He explained that he excluded these six doctors based on a notation on the data report to exclude them. Dr. Thompson admitted that he did not know who wrote the note and never asked what it meant.

{¶ 24} With regard to his analysis, Dr. Thompson testified that "there was a correlation between age and the raises received. So older physicians got smaller raises." (Tr. 215.) He found that under MHS's new compensation plan, "as [a physician] gets older, [their] raise gets lower[.]" (Tr. 215.) He also testified that under MHS's plan, it appears that "younger physicians will make more money throughout their careers than older physicians[.]" (Tr. 217.) Dr. Thompson further testified that given his findings, Dr. Tseng is expected to suffer, in total,

approximately $181,000 in lost income and $66,000 in lost retirement benefits should he retire at age 70 because of the lower raises and lower overall income under MHS's compensation plan.

{¶ 25} On cross-examination, Dr. Thompson testified that out of the 34 MHS radiologists in his analysis, only 4 of them were vascular interventional radiologists. Dr. Thompson admitted that because of the low number of vascular interventional radiologists, he could not run an analysis on just this specialized position. Additionally, he admitted that there is no impact based on age if he looked at all 34 physicians in the radiology department. And the exclusion of the six doctors changed his analysis from a no age impact to an age impact. When asked by MHS's counsel if his "subjectivity went from no impact to an impact," Dr. Thompson replied, "Yes." (Tr. 259.) Four of these six physicians were over the age 40 and received pay increases ranging from approximately $19,000–$65,000.

{¶ 26} Dr. Thompson's analysis also included other grandfathered physicians who already had a higher base salary at the time the compensation plan went into effect and did not receive pay increases. Dr. Thompson acknowledged that including these "grandfathered physicians" in his analysis was beneficial to Dr. Tseng and that he would not reach the damage portion of his analysis if there is no age impact.

{¶ 27} Dr. Thompson further acknowledged that he was aware that Dr. Tseng was paid more than other vascular interventional radiologists in 2018, 2019, and 2020. He further admitted that since the pay increase in 2021, Dr. Tseng

was paid the same as all other vascular interventional radiologists with the same academic rank. When asked if "two people are doing the same job under equal pay for equal work . . . should be paid the same," Dr. Thompson replied, "If it's the exact same job accounting for their experience[.]" (Tr. 233.) According to Dr. Thompson, Dr. Tseng should be paid more because of his experience, which Dr. Thompson admitted is very strongly correlated with age.

{¶ 28} Following the conclusion of Dr. Tseng's case-in-chief, MHS moved for directed verdict on all counts. MHS argued that there is no evidence of age discrimination, noting that Dr. Tseng did not allege that any MHS employee, in a personal capacity, discriminated against him. With regard to the wage discrimination, MHS argued that Dr. Tseng confirmed that he is being paid equal pay for equal work. Dr. Tseng argued that he met the prima facie case under Ohio's Equal Pay Act by demonstrating that he was paid different wages than younger workers for equal work on jobs requiring equal skill, effort, and responsibility. Dr. Tseng further argued that MHS's compensation plan "falls more harshly on physicians over the age of 40" and he suffered disparate treatment, resulting in "the loss of pay, loss of raise." (Tr. 305, 309.) The court then issued its ruling, granting MHS's motion and dismissing the case with prejudice. The court stated:

> All right. So the court has reviewed all documents presented, recently established case law as well as the Court's trial notes and I want to put the following on the record.
>
> First and foremost, Dr. Tseng, I want to commend you on your years of service to MHS in the practice of medicine.

It is not lost on the Court how deeply you love and cherish your work. You've certainly spent a lifetime going the extra mile sacrificing your time to the benefits of your patients. Your life journey is an illustration of the American dream.

The Court is firmly convinced that MHS mismanaged and failed to communicate with you the proper information regarding the 2021 raise increase.

Had MHS initially given you the correct information, and had MHS responded in a sensitive manner to address a physician with your dedication and experience, we may not be here today.

I completely understand your frustration and feeling that you are not appreciated for your years of service. The Court has to balance those emotions with the letter of the law. In doing so, the Court has reviewed the case law presented and recent opinions including but not limited to the Eighth District Court of Appeals.

In considering wage discrimination claims under [R.C.] 4111.17 and the unlawful discriminatory practices under [R.C.] 4112.02, the Court must consider several factors.

One, was there direct evidence of discrimination and, two, was there indirect evidence of discrimination.

The record is absent of any direct evidence of age discrimination. There was no testimony supporting the finding from any of [Dr. Tseng's] witnesses including Dr. Tseng.

The Court must then look to see the following. Absent direct evidence of age discrimination, a claimant seeking to establish prima facie case via indirect evidence must show that he or she was, one, a member of a protected class, two, was subject to an adverse employment decision, three, is qualified for the position, and four, was replaced by a substantially younger person or that a similarly situated nonprotected employee was treated more favorably.

[Dr. Tseng] has failed to produce evidence to support a claim of indirect discrimination. Further, after applying the seven-step analysis for wage discrimination claim, the Court finds that the MHS pay structure based on specialty and academic rank does not violate Ohio law. The record does not support the Plaintiff has established any if its claim.

After construing the evidence in the light most favorable to the nonmoving party, the Court finds that reasonable minds can come to but one conclusion upon the evidence submitted. Therefore, I am granting directed verdict in favor the defendant pursuant to Civil Rule 50.

(Tr. 317-319.)

{¶ 29} It is from this order that Dr. Tseng appeals, raising the following single assignment of error for review:

The trial court erred when it granted [MHS's] motion for directed verdict because, considering the evidence presented by Dr. Tseng in a light most favorable to him, Dr. Tseng had put forth sufficient evidence as to each essential element of his claims, thus requiring the case to be submitted to the jury.

## II. Law and Analysis

{¶ 30} Dr. Tseng argues the trial court erred when it granted MHS's motion for directed verdict because he put forth sufficient evidence as to each essential element of his claims, requiring his case to be submitted to the jury.

### A. Standard of Review

{¶ 31} We review a trial court's ruling on a motion for directed verdict de novo. *Estate of Crnjak v. Lake Hosp. Sys.*, 2024-Ohio-1977, ¶ 85 (8th Dist.), citing *Rybak v. Main Sail, LLC*, 2012-Ohio-2298, ¶ 33 (8th Dist.), citing *Whitaker v. Kear*, 123 Ohio App.3d 413, 422 (4th Dist. 1997). Civ.R. 50 governs motions for directed verdict and provides in pertinent part:

(A)(4) . . . When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse

to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 32} We note that a motion for directed verdict "'tests the sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses.'" *King-Bey v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1183, ¶ 47 (8th Dist.), quoting *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119 (1996). "A trial court properly grants a motion for directed verdict where the party opposing the motion fails to adduce any evidence of at least one essential element of the claim." *Jones v. Unican Ohio, LLC*, 2022-Ohio-948 ¶ 24 (8th Dist.), citing *Krofta v. Stallard*, 2005-Ohio-3720, ¶ 11 (8th Dist.).

{¶ 33} A jury should consider a plaintiff's claim only if the probative evidence, if believed, "would permit reasonable minds to come to different conclusions as to the essential issue of the case." *Sanek v. Duracote Corp.*, 43 Ohio St.3d 169, 172 (1989). "If substantial evidence exists in support of plaintiff's claim, the motion must be overruled." *Jones* at ¶ 26, quoting *Pariseau v. Wedge Prods., Inc.*, 36 Ohio St.3d 124, 127 (1988).

**B. Ohio's Equal Pay Act**

{¶ 34} Dr. Tseng first argues that MHS's compensation plan violates Ohio's Equal Pay Act because it adversely affects physicians over the age of 40.

{¶ 35} R.C. 4117.17(A), known as Ohio's Equal Pay Act, prohibits the discriminatory payment of wages on the basis of age. The statute provides in pertinent part:

> No employer, including the state and political subdivisions thereof, shall discriminate in the payment of wages on the basis of . . . age . . . by paying wages to any employee at a rate less than the rate at which the employer pays wages to another employee for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions.

R.C. 4111.17(A).

{¶ 36} We note that claims under R.C. 4111.17 are subject to the same standards applied to claims under the federal statute. *Carson v. Patterson Dental Supply, Inc.*, 2009 U.S. Dist. LEXIS 112030, *35 (S.D. Ohio Dec. 1, 2009), citing *Birch v. Cuyahoga Cty. Probate Court*, 392 F.3d 151, 161, fn.6 (6th Cir. 2004); *Creech v. Ohio Cas. Ins. Co.*, 944 F. Supp. 1347, 1353 (S.D. Ohio 1996), citing *Stone v. Greater Cleveland Regional Transit Auth.*, 92 Ohio App.3d 373 (8th Dist. 1993). In *Stone*, this court adopted the following seven elements which a plaintiff must establish in order to prove a prima facie case of wage discrimination under the federal Equal Pay Act:

"1. an employer;

2. pays or paid different wages;

3. to employees of the opposite sex (or of different races);[4]

4. in an establishment;

5. when they are performing equal work on jobs;

6. which require equal skill, effort, and responsibility;

---

4 In *Stone*, we noted that in "[a]dopting this seven-part standard to the present case, the element contained in the parenthesis in No. 3, which was inserted by the [court in *Hollowell v. Soc. Bank & Trust*, 78 Ohio App.3d 574 (6th Dist. 1992)], should reflect the basis of different age, not different race." *Id.* at 384.

7. under similar working conditions. See Section 206(b), Title 29, U.S.Code."

*Id.* at 383, quoting *Hollowell* at 582.[5]

{¶ 37} If a prima facie case is established, the defendant then bears the burden to establish that the difference in wages is justified under one of the four affirmative defenses set forth under R.C. 4111.17(B):

Nothing in this section prohibits an employer from paying wages to one employee at a rate different from that at which the employer pays another employee for the performance of equal work under similar conditions on jobs requiring equal skill, effort, and responsibility, when the payment is made pursuant to any of the following:

(1) A seniority system;

(2) A merit system;

(3) A system which measures earnings by the quantity or quality of production;

(4) A wage rate differential determined by any factor other than . . . age[.]

R.C. 4111.17(B).

{¶ 38} Dr. Tseng contends that during his case-in-chief, he put forth sufficient evidence of each element of his R.C. 4111.17(A) claim demonstrating that MHS's compensation plan pays physicians over the age of 40 less wages than its younger physicians for equal work. Specifically, Dr. Tseng contends that he proved the seven-element test set forth in *Stone*.

---

[5] We note that while the federal Equal Pay Act covers only pay disparity on the basis of sex, R.C. 4111.17(A) prohibits pay disparity on the basis of additional protected characteristics, including age.

{¶ 39} In the instant case, at issue are elements two, three, five, six, and seven. Dr. Tseng contends that MHS paid, and continues to pay, physicians within the radiology department like him, who are over the age of 40, lower salaries than younger radiologists. Dr. Tseng further contends that he and the other physicians within MHS's Radiology Department perform equal work in their positions requiring equal skill, effort, and responsibility under similar working conditions.

{¶ 40} As much as we commend Dr. Tseng for all his years of hard work, training, and service, our de novo review reaches the same result as the trial court — Dr. Tseng cannot meet the prima facie case of discrimination. Indeed, Dr. Tseng's own testimony confirms his inability to prove his case. At trial, Dr. Tseng admitted that he was paid $20,000 more than the other vascular interventional radiologists in his department with the same academic rank in 2018, 2019, and 2020. And since the 2021 pay increase, Dr. Tseng further admitted that all of the vascular interventional radiologists with the same academic rank were paid the same base salary. There is no dispute that the two other physicians, who were in the department at that time, were over 40 years of age. Dr. Tseng testified:

> [MHS COUNSEL]: Okay. And . . . just so we are clear, I should have asked you one final question on this, when we are looking at the interventional radiologist in 2021 and every year after, you testified every interventional radiologist with the same academic rank were paid the same base salary as you, correct?
>
> [DR. TSENG]: Correct.
>
> [MHS COUNSEL]: So equal pay, equal work, right?
>
> [DR. TSENG]: I don't know that statement is true or not but, yes, according to this chart you're equal pay, equal work. Yeah.

(Tr. 134.)

{¶ 41} In support of his argument, Dr. Tseng relies on Dr. Thompson's testimony that physicians over 40 within MHS's Radiology Department earn less wages over their careers under the compensation plan. Dr. Thompson testified that there was a strong correlation between age and lower salaries for older physicians (i.e., that older physicians received and would receive smaller raises over their careers under the compensation plan resulting in lower overall salaries), while controlling for differences in specialty and academic rank among the physicians. Dr. Tseng contends that Dr. Thompson demonstrated that the probability of this correlation occurring merely by chance was only 1.5 percent, "exceptionally low." Indeed, according to Dr. Thompson, "even up to ten percent is statistically significant" to demonstrate an adverse impact. (Tr. 216.)

{¶ 42} Dr. Tseng's reliance on Dr. Thompson's testimony in this regard is unconvincing because Dr. Thompson's analysis of the compensation plan as it relates to physicians over the age of 40 was not confined to only interventional radiologists, but instead included all radiologists, no matter their specialty and academic rank within the department. At the time, there were 34 radiologists at MHS who were included in Dr. Thompson's analysis, regardless of their specialty or academic rank. These 34 physicians include vascular interventional radiologists, diagnostic radiologists, breast radiologists, neurononinterventional radiologists, and nuclear medicine radiologists. Dr. Thompson admitted that if he ran an impact analysis with all 34 physicians in the radiology department that there is no impact

finding based on age. (Tr. 230-231). Furthermore, Dr. Thompson testified that he could not conduct an analysis on the four interventional radiologists in the department in 2021 "because with four it's just not enough." (Tr. 229.)

{¶ 43} Dr. Tseng further contends that he and his colleagues in the radiology department all provide patient care in a hospital setting requiring similar education, training, experience, effort, and responsibility. The testimony at trial, however, revealed that while they were all radiologists, each specialty has its own educational or training requirements and the different specialists require different training, perform different duties, have different responsibilities, and utilize different skills. Dr. Tseng admitted that each of the other specialties required different fellowship programs. Dr. Tseng further admitted that "each of these specialties are doing different work with different skills and responsibilities" and described the various specialties as "parts of a machine." (Tr. 115, 123.) Dr. Thompson also agreed with Dr. Tseng's testimony that the other radiology specialties were performing different work than Dr. Tseng. Because the radiology specialists do not perform equal work, Dr. Tseng's reliance upon statistical evidence from the entire radiology department to show that MHS paid and is paying lower salaries over time to older physicians is unpersuasive and does not support a claim that MHS violated Ohio's Equal Pay Act.[6]

---

[6] Dr. Tseng also argues that, under the law-of-the-case doctrine, the trial court rejected MHS's argument that other current and former physicians who had different specialties and academic ranks were not performing equal work by virtue of denying MHS's pretrial motions to strike and motions in limine. We disagree; the trial court's interlocutory orders on motions in limine are not the law of the case. Rather, the law-of-the-case doctrine provides that "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case

{¶ 44} Based on the foregoing, and when construing the facts most strongly in Dr. Tseng's favor, we find that Dr. Tseng did not meet his burden to establish the elements of his wage-discrimination claim. Therefore, the trial court correctly found that MHS paid Dr. Tseng equal pay "for work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions." R.C. 4111.17(A).

{¶ 45} Because Dr. Tseng failed to establish a prima facie case, we do not reach the second part of the analysis under R.C. 4111.17(B) and whether MHS bore its burden to establish that the difference in wages is justified under one of the four affirmative defenses set forth in the statute.

{¶ 46} Having found that the trial court properly granted a directed verdict on Dr. Tseng's equal-pay claim, we next address Dr. Tseng's age-discrimination claim.

**C. Age Discrimination**

{¶ 47} Dr. Tseng argues that he presented sufficient evidence to support his R.C. 4112.02(A) age-discrimination claim under the theories of disparate treatment and disparate impact. With regard to his disparate treatment theory, he contends that MHS discriminated against him on the basis of age when it reduced his base salary rate by giving him a lower wage increase than other physicians who were substantially younger, less experienced, and had less seniority than him. With

---

at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984), citing *Gohman v. St. Bernard*, 111 Ohio St. 726, 730 (1924).

regard to his disparate impact theory, Dr. Tseng contends that MHS's compensation plan falls more harshly on physicians over the age of 40, thus causing a statistically significant disparate impact, at a 1.5% probability, which indicates a strong correlation between age and lower salaries.

### 1. Disparate Treatment

{¶ 48} Under R.C. 4112.02(A), it is "an unlawful discriminatory practice" "[f]or any employer, because of the . . . age . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." "A plaintiff may prove intentional age discrimination in employment (1) by direct evidence that a termination or other adverse employment decision was motivated by age; or (2) indirectly, by circumstantial evidence, using the burden-shifting method articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by the Supreme Court of Ohio in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), and *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981), and modified in *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781." *Jones*, 2022-Ohio-948, at ¶ 29 (8th Dist.).

{¶ 49} In the matter before us, there was no direct evidence of age discrimination. Dr. Tseng testified that no MHS employee personally discriminated

against him based on his age. (Tr. 102.) As a result, Dr. Tseng had to prove age discrimination using the indirect method of proof.

{¶ 50} A plaintiff seeking to establish a prima facie claim of disparate-treatment age discrimination through indirect evidence must demonstrate that he or she "(1) is a member of a protected class, (2) was subject to an adverse employment decision, (3) is qualified for the position, and (4) was replaced by a substantially younger person or that a similarly situated nonprotected employee was treated more favorably." *Leeds v. Weltman, Weinberg & Reis Co., L.P.A.*, 2021-Ohio-4123, ¶ 36 (8th Dist.), citing *Mauzy v. Kelly Servs.*, 75 Ohio St.3d 578, 582 (1996).

{¶ 51} Dr. Tseng focuses his argument on two examples of adverse employment actions by MHS. The first example he presents is that he received wage increases less than his colleagues, Drs. C. and K., who were nine to ten years his junior and "substantially younger under the law." And the second example is that he continues to be paid at a lower rate than his younger colleagues under MHS's compensation plan, which he contends was demonstrated by Dr. Thompson's statistical evidence.

{¶ 52} With regard to Dr. Tseng's first example, the evidence at trial revealed that these physicians were over 40 years of age, held the same position and academic rank as Dr. Tseng, and as a result were paid the same as Dr. Tseng. As to the second example, Dr. Thompson's testimony is unconvincing. While Dr. Thompson testified that he believed Dr. Tseng should be paid more than other vascular interventional

radiologists performing equal work, Dr. Thompson also implemented exclusions and made comparisons to specialties beyond vascular interventional radiologists in reaching his opinion. Dr. Thompson testified that he excluded six physicians from his analysis based solely on the notes to exclude them. He acknowledged that the exclusion of these six physicians changed his analysis from a no age impact to an age impact. He testified that four of the six physicians were older than 40 years of age and their pay increases ranged from approximately $19,000-$65,000. Additionally, Dr. Thompson included the "grandfathered physicians" in his analysis, who already had a higher base salary, which was beneficial to Dr. Tseng's age analysis because they did not receive pay increases in 2021.

{¶ 53} Based on the foregoing, we find that Dr. Tseng did not present evidence to prove that the compensation plan caused an adverse impact on employees over 40. As a result, Dr. Tseng did not establish a prima facie case of disparate-treatment discrimination.

### 2. Disparate Impact

{¶ 54} Similarly, Dr. Tseng failed to prove his prima facie case of disparate-impact discrimination. Disparate-impact discrimination "'involves employment practices that are facially neutral in their treatment of different groups but fall more harshly on one group.'" *Chisholm v. Cleveland Clinic Found.*, 2019-Ohio-3369, ¶ 28 (8th Dist.), quoting *Albaugh v. Columbus*, 2003-Ohio-1328, ¶ 11 (10th Dist.). "To establish a disparate-impact-discrimination claim, the plaintiff must identify a specific employment practice that is allegedly responsible for any observed disparity

and present relevant statistical evidence sufficient to show that the employment practice in question caused the alleged discrimination." *Id.* at ¶ 29, citing *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977 (1988); *Miller v. Potash Corp. of Saskatchewan, Inc.*, 2010-Ohio-4291, ¶ 49 (3d Dist.), citing *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008).

{¶ 55} We note that the statistical evidence offered in support of a disparate-impact-discrimination claim must be statistically significant. ""Statistical significance" establishes that the outcome of a particular process is not due to chance, but rather is causally linked to the variable issue * * *."" *Id.* at ¶ 30, quoting *Bert v. AK Steel Corp.*, 2006 U.S. Dist. LEXIS 22904, *6 (S.D. Ohio Apr. 24, 2006). The "'statistical disparities must be sufficiently substantial that they raise such an inference of causation.'" *Id.*, quoting *Watson* at 994-995. To put it simply, "'statistical disparities must be sufficiently substantial that they raise such an inference of causation.'" *Id.* at ¶ 30, quoting *Watson* at 994-995. Additionally, ""An adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact."" *Id.*, quoting *Warden v. Ohio Dept. of Natural Resources*, 2014-Ohio-35, ¶ 54 (10th Dist.), quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 121 (3d Cir. 1983).

{¶ 56} Here, Dr. Tseng offered no relevant statistical evidence sufficient to demonstrate that MHS's compensation plan falls more harshly on physicians over 40 years old. As discussed above, Dr. Thompson's testimony is unconvincing. Dr. Thompson implemented exclusions and made comparisons to specialties

beyond vascular interventional radiologists in reaching his opinion. Dr. Thompson also acknowledged that the exclusion of six physicians from his analysis changed his analysis from a no age impact to an age impact. Four of the six physicians were older than 40 years of age and their pay increases ranged from approximately $19,000-$65,000. Additionally, Dr. Thompson included "grandfathered physicians" in his analysis, who already had a higher base salary, which was beneficial to Dr. Tseng's age analysis because they did not receive pay increases in 2021. We note that a "disparate-impact discrimination claim fails in the absence of significant statistical evidence." *Id.* at ¶ 32, citing *Abram v. Greater Cleveland Regional Transit Auth.*, 2002-Ohio-2622, ¶ 48-49 (8th Dist.) (dismissing disparate-impact claim where numerical adverse impact was not statistically significant).

{¶ 57} Because Dr. Tseng did not present a statistically relevant analysis to prove that the compensation plan caused an adverse impact on employees over 40, we find that he failed to support his claim of disparate-impact discrimination with significant statistical evidence. "'Without evidence that [the employer] treated similarly situated employees outside of the protected class differently, [an employee] cannot establish a prima facie case of age discrimination.'" *Leeds* at ¶ 42, quoting *Wagner v. Matsushita Electronic Components Corp. of Am.*, 93 Fed.Appx. 714, 717 (6th Cir.2004).

{¶ 58} Therefore, after construing the evidence most strongly in favor of Dr. Tseng, we agree with the trial court and find that reasonable minds could come

to but one conclusion that the directed verdict on his age-discrimination claim was proper.

{¶ 59} The sole assignment of error is overruled.

{¶ 60} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR